**UNITED STATES, Appellant,**

v.

**HAMILTON ENTERPRISES,
INC., Appellee.**

**Appeal No. 37–82.**

United States Court of Appeals,
Federal Circuit.

June 6, 1983.

Louis R. Davis, Washington, D.C., for appellant. With him on brief were J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Peterson, Washington, D.C.; Mark N. Stempler and Donald G. Featherstun, Dept. of the Navy, Washington, D.C., of counsel.

Jack D. Brown, Yuba City, Cal., for appellee.

Before MARKEY, Chief Judge, COWEN, Senior Circuit Judge, and BALDWIN, Circuit Judge.

COWEN, Senior Circuit Judge.

This is an appeal by the United States (Government or Navy) from a decision of the Armed Services Board of Contract Appeals [1] (Board or ASBCA) in which the Board held that it had jurisdiction under the Contract Disputes Act of 1978 (CDA) of the appellee's (Hamilton or contractor) claim for reformation; that Hamilton's con-

1. 82–1 BCA ¶ 15,626, January 29, 1982.

tract was improperly terminated for default; that the excess reprocurement costs which the Government claimed should be disallowed, and that the Government's claim for the cost of military services furnished in the performance of the contract should be denied. The Board found that Hamilton made a mistake in its bid; that the Government's request for verification was inadequate, and that the acceptance of Hamilton's low bid resulted in a contract that was unconscionably priced. In addition to the other relief granted, the Board found that Hamilton was entitled to recover its losses which amounted to $206,101.

We affirm the Board's denial of the Government's claims for excess reprocurement costs and for the costs of military services furnished by the Navy. However, we reverse the Board's award of damages to the contractor and hold that its recovery is limited to the amount retained by the Navy as an offset against the claim for excess reprocurement costs.

## I. *Background.*

On February 28, 1979, the Navy awarded Hamilton a fixed price contract to provide mess attendant services for the enlisted men's dining facility at the Naval Air Station, near Memphis, Tennessee. The initial contract was for 6 months, with an option for an additional 12 months. The contract was to be performed in three phases. Phase I commenced April 1, 1979, and required Hamilton to clean the dining facility. Phase II, which commenced May 1, 1979, continued the responsibilities of Phase I, and also obligated the contractor to set up, operate and secure the serving line. Phase III, which commenced June 1, 1979, continued the duties involved in Phases I and II and in addition, required Hamilton to perform specified duties in the vegetable preparation room. The purpose of the phasing-in periods was to offset the fact that the successful bidder would be the first civilian contractor in the fourth largest mess facility in the Navy.

As the result of formal advertising, 31 bids were received as follows:

| Bidder | Total Evaluated Bid |
|---|---|
| Groves Contract Services, Inc. | $ 966,037.3173 |
| Aseptic Services, Inc. | 1,012,748.77 |
| Trinity Services, Inc. | 1,023,397.164 |
| Hamilton Enterprises, Inc. | 1,025,178.795 |
| Hume, Inc. | 1,034,203.555 |
| United Services, Inc. | 1,240,185.60 |
| Space Services of GA. | 1,253,842.832 |
| World Wide Services, Inc. | 1,389,856.012 |
| Versal Enterprises | 1,392,518.00 |
| K & P Food Services, Inc. | 1,405,943.99 |
| Allied Industrial Services | 1,405,947.04 |
| Tamp Corp. | 1,611,057.28 |
| Urban Laboratories | 1,630,011.328 |
| TAM, Inc. | 1,645,624.857 |
| Jets Services, Inc. | 1,658,700.00 |
| Versatile Services, Inc. | 1,674,666.873 |
| Palmetto Enterprises | 1,682,942.081 |
| Malones Better Management | 1,691,396.45 |
| Murphy Super Services | 1,703,657.74 |
| Emmanuel Services | 1,752,300.00 |
| Industrial Maintenance Services | 1,807,387.063 |
| M & M Services | 1,812,067.53 |
| T & S Services | 1,830,115.98 |
| Management Services | 1,900,172.00 |
| Meldick Services | 1,910,620.069 |
| Old Hickory Services | 1,961,841.50 |
| Diversified Equipment | 1,988,040.00 |
| Gill Hill Enterprises | 2,024,946.00 |
| TBS Service Co. | 2,480,072.00 |
| Ky. Building Maintenance | 2,670,757.00 |
| Logistical Support, Inc. | 2,770,950.576 |

The Government's estimate for the services was $3,251,130, making Hamilton's bid only 31 percent of that estimate.

The initial low bidder was allowed to withdraw its bid, because of a mistake in its G & A costs. The second low bidder became bankrupt and was determined to be nonresponsible. The third low bidder was disqualified, because of its refusal to extend its bid past the initial acceptance date because of an alleged mistake in its bid.

In response to the Government's request, Hamilton verified its bid; the Government performed a pre-award bid survey, and then awarded the contract to Hamilton without holding a prebid conference.

Hamilton began performance on April 1, 1979. On May 2, 1979, Hamilton filed a

request with the contracting officer for an equitable adjustment. The claim was for excess hours of work allegedly expended by Hamilton's employees as a result of the failure of the Government to furnish equipment and supplies it was obligated to provide, and because of work which Hamilton says it was required to perform in violation of the terms of the contract. Except for two small claims, the contracting officer, on May 30, 1979, denied the request for an equitable adjustment.

On June 1, 1979, Hamilton filed a second request for an equitable adjustment, which like the first claim was a request for compensation for the cost of additional hours of work which Hamilton claimed were not required by the terms of the contract and the specifications.

By letter of June 19, 1979, to the contracting officer, the contractor's attorney stated that in view of the manhours of labor required to perform the contract, Hamilton was losing so much money that it would soon be bankrupt. The letter further stated that since the contracting officer had denied Hamilton's request to terminate the contract for the convenience of the Government, Hamilton had no alternative but to reduce the manhours performed at the facility to the contractor's estimate of manhours (namely 456 manhours per day) furnished to the Government before the bid was accepted.

Beginning on June 28, 1979, Hamilton reduced its staffing to the 456 manhours per day estimated in its manning charts. Prior to that time, Hamilton had been providing about 1,100 manhours per day, which was close to the number of manhours the Government had estimated in preparing the bid package for letting the contract.

On June 29, 1979, the contracting officer sent Hamilton a cure notice, stating that the Government was considering terminating of the contract for default. On July 9, 1979, the contracting officer issued a decision in which a majority of the items in Hamilton's second claim was denied, and the contract was terminated for default. Hamilton timely appealed the denial of its claims for equitable adjustment and the decision terminating the contract for default, and stated that it elected to proceed under the CDA.

During the period between June 28, 1979 and July 10, 1979, more than 12,710 military manhours were expended by the Navy in order to raise to an acceptable level the sanitation and service provided by Hamilton's personnel. The total cost of this military service was $44,582.87. Hamilton was advised that this amount would be deducted from its invoices.

Following the termination for default, a reprocurement contract was negotiated, and an award to another contractor was made on July 17, 1979. On July 23, 1979, the contracting officer assessed excess reprocurement costs of $109,124.03 against Hamilton. The Navy withheld payment on invoices totaling $60,262 to offset the reprocurement costs. On July 31, 1979, Hamilton appealed the decision assessing the excess reprocurement costs against it.

Prior to the appeals to the Board, none of Hamilton's claims was certified to the contracting officer in accordance with 41 U.S.C. § 605(c)(1).

On August 15, 1979, Hamilton filed its first complaint with the Board, stating that it elected to have the CDA apply to all of its claims. Hamilton alleged that it was entitled to recover $345,879 on claims for equitable adjustment which had been denied by the contracting officer. On October 30, 1979, Hamilton filed a supplemental complaint which incorporated by reference the allegations of the first complaint. In this complaint, its claims for equitable adjustment were certified in the form and manner provided by statute, 41 U.S.C. § 605(c)(1). On November 14, 1979, Hamilton filed a second supplemental complaint which incorporated the allegations of the first two complaints and added a new and third cause of action in which the contractor requested reformation of the contract due to a bid mistake and claimed damages in the amount of $345,879.30. The claims set forth in the second supplemental com-

plaint were properly certified in accordance with the CDA.

A consolidated hearing was held by the Board on Hamilton's appeals between July 8, 1980 and July 14, 1980.

On July 9, 1981, the parties filed a stipulation with the Board in which they agreed that there had been a *de facto* decision of the contracting officer on Hamilton's reformation claim.

On February 4, 1982, the Board issued a decision in favor of Hamilton on the four appeals.

As previously stated, the Board held that under the circumstances, the acceptance of Hamilton's low bid resulted in an unconscionably priced contract; that the termination for default and the assessment for excess reprocurement costs should be set aside, and that the Government's claim for military personnel costs should be denied. The Board awarded Hamilton damages in the amount of $266,363, consisting of Hamilton's stipulated loss of $201,101, plus $60,262 which had been withheld by the Navy to offset the reprocurement costs. Thereafter, the Government filed its petition for review of the Board's decision in accordance with the provisions of the CDA, 41 U.S.C. § 607(g)(1)(B).

## II. *The Certification Issue.*

Hamilton's contract was entered into February 28, 1979, one day before the effective date of the CDA (March 1, 1979). After March 1, 1979 and during the performance of the contract, Hamilton filed with the contracting officer the above described claims for equitable adjustments in the contract price. As stated above, the claims were based essentially on the grounds that additional time on the part of Hamilton's employees was made necessary because of the unavailability of equipment and supplies which the Government was obligated to furnish and because the Navy had required Hamilton to perform work in excess of its contractual obligations. The claims exceeded $50,000 in amount, but neither was certified to the contracting officer as required by 41 U.S.C. § 605(c)(1). However, since the claims were initiated after March 1, 1979, Hamilton asserted in its appeals that it had, for that reason, elected to proceed under the CDA.

After its request for a consolidation of its four appeals was granted, Hamilton first filed with the Board a complaint contending, as it did in the submissions to the contracting officer, that the Government had breached the contract and therefore that it was entitled to the equitable adjustments denied by the contracting officer. Hamilton also alleged that the default termination was wrongful and that in view thereof, the Navy was not entitled to recover the excess costs of reprocurement and that the Government had unlawfully withheld the sum of $60,262.30 due Hamilton as an offset on the reprocurement claim. Hamilton further denied that it was indebted to the Government for the cost of the services of Navy personnel which were used to supplement the contractor's personnel. Hamilton's complaint sought recovery in the amount of $345,879.30 on its claims for equitable adjustments.

In its supplemental complaint dated October 3, 1979 and filed with the Board, Hamilton incorporated by reference the allegations that had been set forth in its original complaint and attached thereto a certification in the form and manner required by 41 U.S.C. § 605(c)(1).

On November 14, 1979, Hamilton filed with the Board its second supplemental complaint in which it incorporated by reference all of the allegations which had been contained in the two complaints it had previously filed. However, for the first time, Hamilton added a new and third cause of action—a claim for reformation of the contract based on grounds which had never been presented to the contracting officer in any of Hamilton's previous claims. Hamilton alleged that before the contract was awarded, the Government became aware that Hamilton's bid was substantially below the bids of other contractors; was also substantially lower than the Government's estimate of the total contract price, as well as the Government's estimate of the manhours

required to perform the contract; that the Government should have known that there was a mistake in the bid but nevertheless proceeded to award the contract at a price so low that the Government was getting something for nothing; that the award of the contract was unconscionable and that Hamilton was entitled to reformation and additional compensation for the amount it actually expended. This complaint had attached thereto a certification in the form and manner required by 41 U.S.C. § 605(c)(1).

On November 19, 1979, Hamilton's attorney wrote the trial attorney for the Navy and referred to a previous telephone conversation in which counsel for the Navy had stated that he intended to move that the Board disallow the filing of Hamilton's supplemental complaint until such time as the issue of reformation was submitted to the contracting officer for a final decision. The letter further stated that Hamilton's attorney would not be opposed to submitting the reformation claim to the contracting officer, but that if an unfavorable decision were made, Hamilton would appeal to the Board. In the letter, he agreed that the reformation claim should be submitted to the contracting officer, provided it would not unduly delay the hearings before the Board, and provided also that the supplemental complaint would be deemed a request to the contracting officer for a decision on the reformation claim and an appeal to the Board in the event the contracting officer denied the claim.

On June 9, 1981, the trial attorney for the Navy sent Hamilton's attorney a proposed stipulation. An accompanying letter stated that the purpose of the stipulation was "to resolve the issue of the Board's jurisdiction to entertain your claim for reformation under the contract." The stipulation was duly signed by Hamilton's attorney and filed with the Board. The document referred to the fact that in its second supplemental complaint of November 14, 1979, Hamilton had sought reformation of the contract as an additional remedy on the ground that the prebid actions of the contractor and the Government "constituted a legally redressible mistake in the bid." The stipulation also stated that the Navy had filed a supplemental answer after consulting with the contracting officer and that the contracting officer and counsel for the Navy had considered the fact that Hamilton had not previously raised the issue of mistake in its bid, as well as the apparent absence of a final decision on that issue.

The stipulation went on to provide that both the contracting officer and the Navy had concluded that an additional final decision on the mistaken bid issue was unnecessary for the following reasons:

5. In the Contracting Officer's decision to terminate the subject contract for default, he expressly considered all the operative facts which form the basis of Appellant's mistake in bid argument.

6. By letter dated 22 June 1979 (Rule 4, Tab 67), Appellant, in seeking a termination for convenience, presented essentially the same factual allegations to the Contracting Officer as were later alleged in the second supplemental complaint.

7. By later seeking reformation instead of a termination for convenience, Appellant was merely seeking an alternative remedy, based on the same operative facts. In such a situation, the Contracting Officer felt it would serve no purpose to issue another final decision.

8. The need for a final decision was also discussed by counsel of the respective parties. At this time Appellant was informed that the Contracting Officer had informally considered the additional claim for reformation, and if asked for a final decision, would deny the claim on the same basis as the decision to terminate the contract for default rather than for convenience.

9. To the extent a final decision is necessary to provide a jurisdictional basis for the Board's consideration of an Appellant seeking the remedy of reformation, the parties hereby stipulate that the aforesaid facts constitute a *de facto* final

decision sufficient to justify a finding that jurisdiction exists.

Except for its erroneous argument that Hamilton's reformation claim was merely a relabeling of its claims for equitable adjustments, the Government does not disagree with the foregoing recitation of the facts pertaining to the certification issue. However, it contends that the Board committed legal error in assuming jurisdiction under the CDA over Hamilton's claims.

Relying on *Paul E. Lehman, Inc. v. United States,* 673 F.2d 352 (Ct.Cl.1982) and *W.H. Moseley Company, Inc. v. United States,* 677 F.2d 850 (Ct.Cl.1982), the Government first argues that the Board could not legally exercise jurisdiction under the CDA over Hamilton's claims for equitable adjustment which had been denied by the contracting officer and that the reformation claim was a mere relabeling of the previously denied claims. These contentions are rejected. Even a cursory comparison [2] of the reformation claim, as set forth in the second supplemental complaint, with the claims for equitable adjustments previously submitted to the contracting officer will demonstrate that the legal basis for the reformation claim was entirely different from the grounds on which Hamilton sought approval of its equitable adjustment claims. *Lehman* and *Moseley* have no application to this new claim; [3] the parties to the stipulation recognized that the reformation claim was an alternative remedy based on grounds which had never been raised before, namely a mistake in Hamilton's bid. Moreover, it is clear from its decision that the Board did not undertake to exercise jurisdiction over or to decide the merits claims for equitable adjustments under section 8(d), 41 U.S.C. 607(d). Manifestly, its decision was limited to the merits of Hamilton's claim for reformation of the contract.

The Government also contends that the reformation claim did not comply with the certification requirement because the claim was never submitted as a formal, certified claim to the contracting officer for his final decision. This position of the Government collides head-on with the facts set forth in the stipulation. There is no doubt that the reformation claim was certified in the language of the statute and sworn to as required. There is no doubt that it was initiated after March 1, 1979, when the CDA became effective. Although it was done through the medium of counsel for the Navy, there is also no doubt that the certified reformation claim was submitted to the contracting officer; that it was considered by him, and that for all practical purposes it was denied.

The facts relating to the certification issue are, in essential respects, quite similar to those involved in this court's recent decision in *Essex Electro Engineers v. United States,* 702 F.2d 998 (Fed.Cir.1983). There, as in this case, the contractor asserted a new claim after the appeal to the board. The claim was then certified, submitted to the contracting officer, and after he denied it, the Board proceeded to exercise jurisdiction under the provisions of the CDA and rendered a decision on the merits.

For the reasons stated, we hold that there was substantial compliance with the certification requirements of the CDA, and that the Board had jurisdiction to consider and decide the merits of the contractor's alternative claim for reformation of the contract in accordance with the provisions of the CDA.

**2.** Copies of Hamilton's three complaints are attached to appellee's brief. Copies of the claims Hamilton submitted to the contracting officer prior to the appeals to the Board are in evidence as tabs 33 and 56 of the Government Rule 4 file.

**3.** In view of this court's recent decision in *W.M. Schlosser Co. v. United States,* 705 F.2d 1336 (Fed.Cir.1983), the Board could legally have exercised jurisdiction over Hamilton's claims for equitable adjustments if after its appeals had been filed, Hamilton had certified these claims, resubmitted them to the contracting officer, and requested the Board to decide the merits of the claims under the provisions of the CDA after the contracting officer's denial of the resubmitted claims. In that case, as in this, the contract was entered into before the effective date of the CDA.

### III. *The Reformation Issue.*[4]

#### A. *The Adequacy of the Government's Verification of the Contractor's Bid.*

■ The Naval Air Station where the contract was performed is located in the small Navy town of Millington, about 15 miles from Memphis, Tennessee. The Government's bid package consisting of the basic specifications, the cost estimate, and the manning charts was prepared under the direction of the Naval supply officer at Millington by experienced Navy personnel who were actively engaged in the day-to-day operations of the facility. The manning charts, which showed the estimated manhours of labor that would be required for the performance of each of the three phases of the contract, were prepared for the use of the Government's procurement officer. By comparing the Navy's manning charts with those which the contractor was required to submit with the bid, the procurement officer can determine whether the bidder has an understanding of the scope of the contract and has submitted a reasonable bid.

The contracting officer and Navy personnel who handled the procurement of this and other contracts were stationed at Charleston, South Carolina. A Navy officer referred to as the buyer was responsible for receiving and analyzing the bids, and recommending the acceptance of the lowest responsible bid. When he received Groves' bid, which was the lowest submitted, he requested verification of the bid because it was so much lower than the others that the possibility of an error was indicated. His letter also stated:

> In addition a wide disparity exists between your estimated manhours and the Government's estimate of manhours necessary to perform the required services.

As previously stated, Groves' bid was later withdrawn because of a mistake therein.

When the buyer examined Hamilton's bid, he suspected a mistake in the bid because of the low amount compared with the Government's estimate. Therefore, he wrote Hamilton a letter on January 3, 1979, in which he stated:

> The bid submitted by your firm is so much lower than the others as to indicate the possibility of an error. Further, you did not submit a manning chart as required and you are hereby requested to submit the same with your response thereto.

Hamilton responded by letter of January 12, 1979, stating:

> Please be advised that as per your letter of January 3, 1979; we have again studied our bid package and find that we have made no errors in the above-referenced IFB [Invitation for Bids]. We are enclosing our manning charts for your inspection per your request.

Hamilton was not furnished a copy of the Government's estimate of manhours or total cost and no further attempt was made to verify Hamilton's bid or to advise it, as had been done in the case of Groves, that its manhour estimate was considerably below the Government's estimate.

After receiving Hamilton's confirmation and its manning charts, the buyer prepared an analysis of Hamilton's bid as compared to the Government's estimate; this disclosed that Hamilton's manpower estimate was 30.31 percent of the Government's estimate. The comparison shown by the analysis was as follows:

|           |                 | Government | Contractor |
|-----------|-----------------|-----------:|-----------:|
| Phase I   | Weekday         | 994.5      | 305        |
|           | Weekend/Holiday | 633.      | 180        |
| Phase II  | Weekday         | 1,373.     | 428        |
|           | Weekend/Holiday | 893.5      | 272        |
| Phase III | Weekday         | 1,521.     | 456        |
|           | Weekend/Holiday | 987.5      | 300        |
| Totals    |                 | 6,402.5    | 1,941      |

---

**4.** The facts set forth in this Part III consist of findings of fact made by the Board which we find to be supported by substantial evidence or other facts which are based on undisputed evidence in the record. On appeal, if the Board has failed to make a relevant finding of fact which is established by undisputed evidence, the court may make a supplemental finding. *Ordnance Research, Inc. v. United States,* 609 F.2d 462 (Ct.Cl.1979); *Koppers Co. v. United States,* 405 F.2d 554, 559 (Ct.Cl.1968).

The analysis further stated that Hamilton had confirmed its bid and that although its estimated manhours are "significantly lower than that projected by the Government, the offeror's proposed hours were considered adequate to perform the requirements based on prices bid and hours proposed by other bidders."

Before accepting the bid, the Navy made a pre-award survey which indicated that Hamilton had a good performance record in other mess attendant contracts and had received several awards therefor. The survey team had a copy of Hamilton's manning charts, but was not given a copy of the buyer's analysis showing the disparity between Hamilton's estimate and that of the Government.

The buyer's analysis and the pre-award survey were considered by a contract review board, which recommended the acceptance of Hamilton's bid. The procurement office in Charleston did not seek the advice of the supply officer in Memphis, under whose direction the Government's estimates had been prepared, as to the choice of a responsible source for performance of the contract work. The supply officer was skeptical that Hamilton could perform for the price it had bid, and the experienced Navy personnel at the Naval Air Station considered that the tasks required by the contract could not be performed to the standards envisioned by the Navy by a contractor who proposed to use a work force that was less than 50 percent of the manhours used by the Navy in performing the same services prior to the letting of this contract.

On the basis of the record before it, the Board concluded that once Hamilton submitted its manning charts, which were grossly under the Government's estimate, the Navy was dutybound to request another verification which called attention to the suspected mistake and the reason for that suspicion. The basis for the suspicion, as the Board saw it, was not the bids of the other bidders but the vast disparity between the Government's estimate and Hamilton's bid.

The Board also held that while the Government ordinarily is not required to disclose its estimate, here that estimate was based on the Government's own experience of which the bidders were ignorant. Consequently, the Board declared that the Navy's estimated manhours should have been disclosed at least to the proposed awardee as a basis for suspecting a mistake and that since verification was not requested on that ground, the verification was inadequate.

■ After a careful study of the record and the pertinent authorities, we affirm the Board's holding that the Government's request for verification of the contractor's bid was inadequate. There are a number of facts which we find persuasive of this result. Hamilton was the first civilian contractor in a facility which had previously been operated by the military. The Board attached special significance to the Government's estimate of the manhours of labor required to perform the contract and we think this was proper. In view of the fact that the estimate was prepared by experienced Navy personnel who had first-hand knowledge of the manhours which would be needed to perform the various phases of the contract and the purpose for which it was to be used, the buyer should have surmised that there was an error in the bid because of the great disparity between Hamilton's estimate and the Government's manning charts. In the comparable situation involved in the bid submitted by Groves, the buyer suspected that there was an error in the bid because of the disparity between the bid and the Government's manning estimate, and Groves was asked to provide a verification of this estimate. The failure of the Navy to accord the same treatment to Hamilton is a crucial fact in this case.

The landmark case on the adequacy of the Government's verification of bids in which mistakes are or should have been suspected is *United States v. Metro Novelty Mfg. Co.*, 125 F.Supp. 713 (S.D.N.Y.1954). There the court held that the request for verification was inadequate because it failed to put the bidder on notice of the mistake which the contracting officer sur-

mised. The *Metro* case was cited in *Chernick v. United States,* 178 Ct.Cl. 498, 372 F.2d 492 (Ct.Cl.1967), but there appears to be a paucity of court decisions on the question. However, in applying the rule in *Metro,* the Comptroller General has issued several decisions in which he has held that where a disparity, such as that which is present in this case, is brought to the notice of the contracting officer, the bidder must be placed on notice of the nature and extent of the mistake which is suspected. *See, e.g.,* 44 Comp.Gen. 383 (1965).

In Unpub.Comp.Gen. B–177405, Nov. 29, 1972, the contracting officer noted that there was disparity in the amounts between the low bid, the second low bid, and the Coast Guard estimate. The contracting officer requested a verification, advised the bidder that the disparity in the bids existed, and sent a copy of the abstract of bids. He failed to indicate that there was a difference between the contractor's bid and the Government's estimate. In holding that the verification was inadequate in that case, the Comptroller General stated that in order for a request for verification to conform with the good faith dealings expected of the Government's contracting officials, the request should be as fully informative as possible concerning the pertinent factors indicating to the contracting officer that an error might have been made in the bid.[5]

In addition to the decisions of the Comptroller General, comments in two law review articles have assisted us in resolving the issue. The first of these is: Doke, *Mistakes in Government Contracts—Error Detection Duty of Contracting Officers,* 18 Sw. L.J. 1 (1964). In applying the *Metro* principle, Doke states that the holding in that case:

> would be expressed more accurately by a statement that a request for verification is insufficient if the contracting officer fails to put the bidder on notice of the reasons why a mistake is surmised. [18 Sw L.J. at 34]

The second and more recent article is: Hagberg, *Mistake in Bid, Including New Procedures Under Contract Disputes Act of 1978,* 13 Pub.Contract L.J. 257 (1983).

After reviewing several decisions of the Comptroller General, Hagberg summarized the rulings as follows:

> The contracting officer must consider all of the circumstances involved in the acquisition, not just the prices offered by the low and next low bidder. The full range of bids, as well as the Government estimate, should be considered in deciding whether or not a verification request is necessary. [13 Pub.Contract L.J. at 263]

### B. *The Contractor's Erroneous Bid vis-a-vis the Requirements for Reformation.*

■ A contract will not be reformed because of a unilateral mistake in a bid unless the contractor establishes that the error resulted from a "clear cut clerical or arithmetical error, or a misreading of the specifications." *Aydin Corp. v. United States,* 669 F.2d 681 (Ct.Cl.1982); *Ruggiero v. United States,* 420 F.2d 709 (Ct.Cl.1970). In such cases, the degree of proof demanded for reformation is higher than where rescission is requested. The contractor must establish by clear and convincing evidence what his bid price would have been but for the error. *Bromley Contracting Co. v. United States,* 596 F.2d 448 (Ct.Cl.1979); *Chernick v. United States, supra.*

■ Here the Board found that aside from the matter of the quantum of bid error, Hamilton did not present any work papers showing the nature of its mistake or what the bid would have been were it not for the mistake. This finding is supported by undisputed evidence. Nevertheless, the Board in its opinion stated:

> We believe that the record sufficiently establishes a basis to conclude that the Hamilton bid was in error. Consequently, notwithstanding verification of the bid

---

**5.** Similar rulings were made in Unpub.Comp. Gen. B–149282, Aug. 7, 1962, and Unpub.

Comp.Gen. B–177405, Nov. 29, 1972.

or the extent thereof, acceptance of appellant's exceedingly low bid resulted in an unconscionably priced contract and relief from the consequences of the mistake may be granted.

After reading the entire transcript of testimony and the pertinent exhibits, we find no basis in the record for the Board's holding that Hamilton made the kind of mistake which entitles it to the equitable remedy of reformation. Hamilton's president, who prepared its bid, did not testify that he had made a mistake in its preparation. He did not point to any clerical or arithmetical error. He did not designate any portion of the specifications which he had misread or misinterpreted and, as a result, miscalculated the bid. The Government has correctly argued that the testimony of Hamilton's president shows that the price which Hamilton submitted was the price it intended to bid.

Persuasive evidence of the fact that Hamilton did not make the kind of error that entitles it to have the contract reformed is found in the written communications of Hamilton's attorney during the period beginning with the submission of the contractor's first claim for equitable adjustment and ending with the filing of the second supplemental complaint with the Board. The attorney prepared the two claims for equitable adjustment which were submitted to the contracting officer on May 2 and June 1, 1979. He requested the contracting officer to terminate the contract for the convenience of the Government rather than for default. He sent a letter containing Hamilton's response to the contracting officer's cure notice on June 28, 1979. On July 3, 1979, he wrote to the contracting officer and contended that the contractor had been performing services far in excess of those called for and required under the terms and specifications of the contract. He drafted the four notices of appeal and filed the three complaints with the Board. Thereafter, he represented the

6. The papers are in evidence as tabs 33, 47, 56, 58, 67, 74, 80, 90 and 91 of the Government

contractor in all proceedings before the Board.

In our examination of these papers [6] which were sent or filed prior to November 14, 1979, we have failed to find a single contention that the contractor had made a mistake in its bid or that Hamilton was entitled to reformation on that ground. It was not until Hamilton's second supplemental complaint was filed with the Board on November 14, 1979, that Hamilton asserted that it had made a mistake in its bid and was entitled to reformation of the contract. The complaint did not describe the nature of the mistake but alleged that the error had been discovered on or about October 25, 1979. However, no evidence was offered to show exactly what was discovered at that time.

The best and perhaps the only evidence which reveals why Hamilton's estimate of the manhours required to perform the contract was so low is reflected in the following finding made by the Board which paraphrases the testimony of Hamilton's president:

16. Prior to bidding, appellant's president made one site visit to Memphis to observe the operation there. Since he felt the facility was somewhat similar to the one at San Diego he offered the same number of hours (456 weekdays under Phase III) even though an estimated 247,000 meals per month were to be served at Memphis, as opposed to 190,000 a month at San Diego. This conclusion was reached because at San Diego two dining facilities were involved which caused some duplication of effort and because of his experience with negotiated section 8(a) [*] contracts; since the customer's desired number of hours was known, there was more latitude in the number of hours furnished. (Tr. 1/206, 211)

[* Hamilton's president explained that the section 8 contracts were entered into between the military agency and the Small Business Administration, which in turn negotiated a subcontract with a private contractor for the performance of the work.]

Rule 4 file.

If we attribute to this finding the ordinary meaning of the words used, we cannot avoid the conclusion that the error in Hamilton's bid resulted from a mistake in judgment on the part of its president. Although he knew that the number of meals to be served at Memphis would be greater than the number of meals served in San Diego during Hamilton's previously performed contract, he assumed that he could provide the services required in the instant contract with the same number of manhours of labor as he had used in San Diego. There is no doubt that his estimate of manhours was far below the manhours actually provided in Hamilton's attempt to comply with the contract. Unfortunately for the contractor, however, it is well established that an erroneous bid based upon a mistake in judgment does not entitle the contractor to reformation of its contract.[7] *Aydin Corp. v. United States, supra; American Ship Building Co. v. United States,* 654 F.2d 75 (Ct.Cl.1981); *National Line Co. v. United States,* 607 F.2d 978 (Ct.Cl.1979); *Tony Downs Foods Co. v. United States,* 530 F.2d 367 (Ct.Cl.1976).

### IV. *Conclusion.*

What emerges from the foregoing is the conclusion that this is a case of mutual fault to the extent that neither party is entitled to recover on the claims asserted against the other. *Hubler Rentals, Inc. v. Roadway Express, Inc.,* 637 F.2d 257 (4th Cir.1981); *Westinghouse Electric Corp. v. Garrett Corp.,* 601 F.2d 155 (4th Cir.1979). "The court must let the chips lie where they fall," Corbin, *Contracts* (1960 ed.) § 598, p. 589.

Accordingly, we affirm the Board's denial of the Government's right to recover for the excess reprocurement costs and the costs of providing the services of military personnel to supplement the contractor's work force. However, we reverse the Board's award of damages in the amount of $206,101 to Hamilton and hold that the amount of its recovery is limited to the sum of $60,262, which the Navy withheld as an offset against the excess reprocurement costs.[8]

AFFIRMED IN PART, REVERSED IN PART, AND MODIFIED.

---

**7.** Hagberg cites several decisions of the Comptroller General for the proposition that even where the mistake results from an error in judgment, relief in the form of withdrawal of the bid may be permitted, provided the error is so extreme that it supports a finding of unconscionability, 13 Pub.Contract L.J. 289. However, this is an action for reformation rather than for rescission, and we have found no court decision in which the rule in the cases cited above has been found inapplicable. *Kemp v. United States,* 38 F.Supp. 568 (D.Md.1941), cited by the Board, is not such a case. There the contractor was permitted recovery because the mistake in his bid was caused by a typographical error in his subcontractor's quotation. The error was called to the attention of the contracting officer a few days after the bid was accepted; he admitted that he was struck by the great discrepancy between the mistaken bid and the other bids. *Bromley Contracting Co. v. United States,* 596 F.2d 448 (Ct.Cl.1979), also cited by the Board, is typical of decisions in which reformation is granted where the mistake in the bid is caused by an arithmetical error. In that case, the contractor failed to add a markup for profit and overhead to his cost figures before submitting the bid.

**8.** In cases where the United States Court of Claims has reformed contracts because of mistakes in contractor's bids, the court adopted the rule that the contractor's recovery may not exceed the difference between its bid and the next lowest bid. *M.L. Shepard v. United States,* 95 Ct.Cl. 407 (1942). *Accord: Bromley Contracting Company, supra,* 596 F.2d at 460; *Chernick, supra,* 372 F.2d at 497; and *Rhode Island Tool Co. v. United States,* 130 Ct.Cl. 698, 128 F.Supp. 417 (1955). Therefore, if we had upheld the Board's decision and applied the Court of Claims rule, Hamilton's recovery would have been limited to the sum of $69,287, consisting of the difference of $9,025 between Hamilton's bid and the bid of Hume, Inc., the next lowest bidder, and the $60,262 withheld by the Navy.