James **GIESLER** and Luke Coniglio,
d/b/a "Central Park Company,"
Plaintiff,

v.

**UNITED STATES** of America, Defendant.

No. 96–554C.

United States Court of Federal Claims.

Sept. 15, 1999.

William E. Gast and Terry K. Gutierrez, Omaha, Nebraska, for plaintiff.

Patricia M. McCarthy, Bryant G. Snee, David M. Cohen and David W. Ogden, U.S. Department of Justice, Washington, D.C., and Sandra L. Guydon, Defense Logistics Agency, Philadelphia, Pennsylvania, for defendant.

## OPINION

BASKIR, Judge.

### Summary

■ This government contract case involves the doctrine of "unilateral mistake." The doctrine holds that a government contract may be reformed or rescinded if the contracting officer accepts a bid with actual or constructive knowledge that it contains an

error. On cross-motions for summary judgment, we find for the plaintiffs.

### Introduction

To the plaintiffs, Mr. James Giesler and Mr. Luke Coniglio, who do business as Central Park, the facts are quite simple: Central Park bid on a contract for mixed nuts with no more than 10% peanuts, using prices quoted to it by its supplier, Flavor House. Central Park was the apparent low bidder. Before the contract was awarded, the government—but not Central Park—received information from Flavor House showing that it intended to supply a different and cheaper mix of nuts—60% peanuts—not the one called for in the Request For Proposal (RFP). Charged with this knowledge, the government had a duty to inform Central Park or at least inquire further about the apparent mistake. Instead, the Government awarded the contract to Central Park, then insisted on the 10% mix when, on the first day of production, it became clear Flavor House was producing the wrong mix. The contract was terminated. Central Park seeks to be relieved of the added reprocurement costs it was assessed when the government had to pay another supplier for the interim increase in market prices for nuts.

Not surprisingly, the government argues the case is far more complex. It contends the doctrine of unilateral mistake requires an evaluation of fault; that is, Central Park's responsibility for the error. Put another way, the government argues that the recognized exception from the doctrine of unilateral mistake for errors of business judgment includes the poor business judgement that led Central Park to rely on Flavor House's understanding of the required specifications without checking. The government also contends that the doctrine has to do with errors in bid prices, and not with errors involving non-bid elements. Finally, the government contends that the doctrine is unavailable to a contractor who terminates or repudiates the contract.

We shall review these and other contested aspects of the case in the following pages. To evaluate them fully, we must first examine the facts in detail. They would make even Murphy blush.

### Facts

On January 17, 1995, the Department of Defense, through its Defense Logistics Agency Defense Personnel Support Center (DLA), issued a solicitation for 8,800 cases of canned shelled mixed nuts. The specifications Section C stated in full:

> NUTS. MIXED. SHELLED. W/ OR W/O PEANUTS. ROASTED. SALTED. 4 LB. NO. 10 SIZE CAN. CID A–A–20164A TYPE I OR II. STYLE 1.

Nowhere in the RFP was the CID reference explained. It was not noted in Section J where materials pertinent to the solicitation are incorporated by reference. In fact, the letters and numbers refer to a "Commercial Item Description" published by the Commerce Department. In this instance, it provides the details of the RFP's specifications; most importantly for our purposes, it provides for a mixed nuts composition of not more than 10% peanuts. The record is unclear to what extent this reference to "CID" is commonly known amongst commercial business, or whether it is an esoteric term familiar only to a few. Suffice it to say, the detailed specifications set forth in "CID A–A–20164A" were not themselves attached to the RFP. This was a critical omission, as Mr. Russell Kinney, Government Pre-award Survey Manager, DLA, later noted in his memorandum of March 27, 1995.

Central Park arranged through a broker, Farner Bocken, to locate a supplier. Farner Bocken in turn contacted various companies and obtained prices. Flavor House was the low bidder and was chosen by Central Park. We do not know what information Farner Bocken conveyed to the candidate suppliers, but apparently Flavor House consistently intended to produce a nut mixture of 60% peanuts. As any lover of salted nuts knows, the more peanuts, the less expensive the product.

On February 9, 1995, Central Park submitted an offer in response to the solicitation. Of the seven companies that submitted offers, Central Park's bid was the lowest. Mr. John Di Babbo, a Government buyer, who

held the position of contract specialist, contacted Mr. Giesler about an apparent anomaly in its bid; its prices for delivered and FOB were the same, whereas one would expect that the former price would be higher. Mr. Giesler confirmed the prices, stating that Central Park had averaged out the two freight alternatives. The parties dispute whether Mr. Giesler assured Mr. Di Babbo that Central Park understood upon what product lines it was bidding. The government alleges that he did and Central Park denies that part of the conversation. But even so, there is no contention that Mr. Di Babbo discussed the nut mix. There was nothing in the bid itself, some 10% lower than the next bidder, that would necessarily alert Mr. Di Babbo to a problem or trigger any obligation to inquire.

The next step in the procurement was a pre-award survey of Central Park and Flavor House. There was some delay in conducting the surveys, prompting a critical reaction from Mr. Gordon Ferguson of the Defense Personnel Support Center dated March 24, 1995, and a defensive explanatory memorandum dated March 27, 1995, by Mr. Russell Kinney, already noted. In the course of explaining the delay, Mr. Kinney pointed out that he did not initially have a copy of the CID specifications, and that they should have been attached to the RFP. (The parties were unable to elucidate this latter comment.) Mr. Kinney obtained a copy of the CID specification sheet from Mr. Di Babbo around March 8, 1995. Mr. Kinney also noted that Central Park did not have a written price quote from Flavor House. It is clear that Mr. Kinney had been in contact with Mr. Giesler in this same time frame, but whether those conversations ever touched on the CID or the actual specifications, we do not know.

Whether prompted by Mr. Kinney's calls or coincidentally, on March 9, 1995, Mr. Giesler also took the occasion to verify Flavor House's price quote and its ability to perform the contract requirements. We quote Flavor House's reply:

This is to confirm our phone conversation March 9, 1995 that Flavor House can and will provide items in Government Bid SPO 300–95–R–9306, Nuts, Mixed, Shelled, 64 ounce Canister.

*We understand all Government Specifications* and welcome any Government visit for inspection. (Emphasis added)

Mr. Giesler's inquiry and the reply went through the broker Farner Bocken. In fact, it appears that all contact between Central Park and Flavor House went through Farner Bocken.

We pause here to observe that, unsurprisingly, Central Park points to this confirming effort as evidence of its care in assuring that all was well and understood. The government, with equal fervor, points out that the inquiry was not designed to disclose the peanut error, but simply underscored the persistent mis-communication. Hindsight makes clear what Mr. Giesler's error was, but it is less easy to say that a reasonable person should have been more precise. As we shall see in a moment, DLA itself was guilty of a similar oversight.

The March 1995 survey of Central Park was apparently unremarkable. It certainly did not explore the precise details of the mixed nuts specifications. The survey of Flavor House is a different story. The report form by Mr. Robert Hansen, the inspector, is dated March 28, 1995, the day after the visit. It recommended approval of Flavor House. The survey reports on technical capability, production capability, transportation, packaging and other requirements. It also contains a Section 3a which states "FIRM HAS AND/OR UNDERSTANDS .... SPECIFICATIONS." The box following is checked "yes."

We do not know what transpired between Mr. Hansen and Flavor House to produce this response on the form. We may safely assume it did not result from a detailed discussion of the precise specifications, including the peanut percentage. Central Park argues that the form was improperly completed; that if the inquiry had been as required, it would have disclosed the latent misunderstanding. The government says that all that was required was for the government inspector to inquire: "Do you understand the specs?" and to receive an affirmative reply.

We note that here the government takes the opposite view from its criticism of Mr. Giesler's attempt to verify Flavor House's understanding of the contract specifications on March 9, 1995. The irony is, of course, that both inquiries shared the same defect. Neither was precise enough to disclose the misunderstanding; they merely served to enforce it. In any event, we know the box was improperly filled out—Flavor House neither had nor understood the specifications.

Although the precise date is disputed, it was probably the next day, March 29, that Mr. Bill Mallis of Flavor House sent an 8-page facsimile to Mr. Hansen. The cover letter stated:

> Attached please find copies of *the documents you requested.* They include *product specifications,* Kosher certificate, line III start-up check list and mixed nuts roasting and packaging (milestone) charts. (Emphasis added)

The fax contained the noted documents, and most significant for our purposes, a sheet specifying the 60% peanuts composition of mixed nuts: "Product: Oil Roasted Regular Mixed Nuts (60% Peanuts)." Mr. Mallis' words are intriguing because they do suggest that Mr. Hansen had specifically requested the Flavor House specifications. The government denies there was any such request. Mr. Hansen was unavailable, and the government offers no support for its objection. Were the point important, we would have to credit the letter and Mr. Mallis' sworn deposition. Except for the government's "bare denial," there is no evidence contradicting the cover letter's words.

Nonetheless, requested or not, Central Park argues the facsimile put the government on actual or constructive knowledge of Flavor House's intention to produce a mix of 60% peanuts, not in conformity with the RFP. The government argues that the specification sheet did not convey that kind of information. It persistently characterizes this as a "bare transmission about a Flavor House product line." Whatever the facsimile was, it was not a "bare transmission." It had a cover letter purporting to respond to a request and it included many pages of information pertinent to the contract and to the survey. Certainly, at the least, it put the government sufficiently on notice to require an inquiry.

The Flavor House facsimile documents were attached to the report of Mr. Hansen's survey and passed up the line to his supervisor, Mr. Perkins, and, in turn, to Mr. Kinney, to Mr. Di Babbo, and finally to the contracting officer, Ms. Aquino. They all testified that they did not read the attachments, an excuse that could just as well come from Mr. Giesler and Flavor House with regard to the contract specifications. We do not question the veracity of these denials, certainly not in the absence of a trial in which the witnesses' credibility could be weighed. But actual knowledge cannot be the issue; the documents were attached to papers which the officials were required to review. Their failure to perform that duty cannot excuse the government from the consequences that would flow if they had done so.

Despite the government's strenuous efforts to minimize Flavor House's facsimile, there can be no question that DLA was on actual or constructive notice that something might well be wrong. At the least, it triggered an obligation to inquire into the meaning of that 60% specification.

Mr. Di Babbo, on deposition, admitted that had he been aware that Flavor House was not proposing to produce a 10% or less peanuts mix, he would not have awarded the contract to Central Park:

> Q. If, prior to the award, you personally knew, subjectively knew that Flavor House was going to produce mixed nuts with more—with a 60 percent peanut content when no more than 10 percent was required, would there have been an award?
>
> ***
>
> A. No.

Deposition Transcript of John Di Babbo at 93.

On April 14, 1995, DLA awarded contract SPO300–95–C–5560 to Central Park. A few days later, Mr. Di Babbo contacted Inspector Scott Ball at the U.S. Department of Agriculture ("USDA") and requested USDA be available to provide assistance to Central

Park as necessary. Mr. Di Babbo recognized that Central Park was new to government contracts and needed special attention.

On June 12, 1995, DLA personnel went to Flavor House to watch the initial production run. It became immediately apparent that the product mix was wrong and the line was stopped. There then ensued an understandable crisis atmosphere. There was the expected confusion, finger-pointing, and attempts to regroup, none of which resolved the matter. At one point, Mr. Giesler promised, somewhat rashly, to give DLA the 10% mix the contract called for. But he soon became unavailable for phone calls, and finally on September 6, 1995, DLA terminated Central Park's contract for default.

The government then sought to arrange a replacement contractor and contacted the previous bidders. John B. Sanfilippo & Sons, Inc., (Sanfilippo) was prepared to perform on short notice, but increased its bid price to reflect an increase in the cost of speciality nuts since its spring bid. The contract was let, and Central Park was assessed the added costs to the government stemming from the increase in raw material prices, $185,625.30. This is the amount in dispute.

We will examine the post-June events in more detail below in the context of the government's argument that the "unilateral mistake" remedy is unavailable when the contractor does not perform.

## Discussion

### Doctrine of Unilateral Mistake

■ The Court of Appeals for the Federal Circuit has apparently adopted the Armed Services Board of Contract Appeals' requirements for applying the doctrine of unilateral mistake and the remedy of contract reformation. In *McClure Electrical Constructors, Inc. v. Dalton,* 132 F.3d 709 (Fed.Cir.1997), the Court addressed an appeal from the ASBCA and found that in order to attain reformation the plaintiff would have to show: (1) the mistake in fact occurred prior to contract award; (2) the mistake was clerical, mathematical, or misreading of specification—not an error in judgment; (3) prior to award the government knew, or should have

known, that a mistake had been made; (4) the government did not request bid verification or the request was inadequate; and (5) proof of the contractor's intended bid.

Central Park argues that the Federal Circuit was not adopting this five prong test, but only endorsing the ASBCA's use of it. We do not find this argument persuasive. The Federal Circuit in no way intimated it was limiting its holding. Moreover, we conclude that Central Park has met those "tough" tests, (its words), or at least the first four. The fifth prong of the test—proof of the intended bid—is obviously limited to reformation cases and not to the lesser remedy of rescission. *United States v. Hamilton Enterprises, Inc.,* 711 F.2d 1038, 1046 (Fed.Cir. 1983); *P.T. Service Company,* GSBCA No. 7589, 1985 WL 16959, 85–3 BCA ¶ 18,430. It seems logical that where a contractor seeks reformation, it must show the terms to which the contract should be reformed, especially if we are talking about mistaken dollar figures. We do not believe this prong is applicable to the remedy of rescission.

It is clear from the record, and the parties do not contest, that the mistake occurred prior to award. We will now examine the remaining three prongs of *McClure.*

### Nature of the Mistake

■ Clearly, a clerical or arithmetic error or misreading of a specification may entitle a bidder to relief. Misreading of the specifications includes mistakes such as omissions of costs or mistaken belief about what is called for in specifications. The error—Central Park's, Flavor House's, or both—came from a misreading of, or failure to read, the specification. This is a "misreading" which may entitle a contractor to relief. *Liebherr Crane Corp. v. United States,* 810 F.2d 1153, 1157 (Fed.Cir.1987).

Central Park's mistake is akin to the contractor's misreading mistake in *BCM Corp. v. United States,* 2 Cl.Ct. 602 (1983). In *BCM* the contractor had misread or misunderstood the specifications as not to require replacement of feeders. It then sought an equitable adjustment for work performed under protest, contending that the government had either actual or constructive notice of an

error in the contractor's bid but failed to call and inquire. The Board of Contract Appeals ruled that the contractor's interpretation of the contract was unreasonable and denied recovery. Although the Court agreed with the Board that the contractor's interpretation was unreasonable, it nevertheless found that an unreasonable interpretation did not foreclose recovery. The contracting officer was still obligated to verify the obviously incorrect bid. *BCM Corp.*, 2 Cl.Ct. at 606, 609, 612–13. The Court stated:

> If the contracting officer is on notice, actual or constructive, of a bidder's mistake; fails properly to verify the bid; and subsequently accepts the bid, a presumption then arises that the contracting officer has acted in bad faith and taken advantage of the bidder and reformation will be permitted.

*BCM Corp.*, 2 Cl.Ct. at 609.

The doctrine does not apply to errors of judgment. The government contends that Central Park made an "error in judgment" in relying on Flavor House's understanding of the specifications without specifically confirming that understanding. There is an essential difference between an oversight or misreading, and a business judgment that turns out wrong. The latter implies an understanding of the requirements, but an assessment that the contractor can satisfy them in another way. *Dakota Tribal Industries v. United States*, 34 Fed.Cl. 593 (1995) (contractor made judgment that non-woven material would satisfy requirement which only woven material would meet); *Liebherr Crane Corp. v. United States*, 810 F.2d 1153 (Fed.Cir.1987) (contractor made judgment that lightweight crane would satisfy requirement that could only be met by heavier crane); and *Hamilton Enterprises, Inc.*, 711 F.2d at 1047 (contractor made judgment that man-hours which were sufficient for one contract would also be sufficient for second contract). Such a "conscious gamble with known risks" is non-compensable. *Liebherr Crane*, 810 F.2d at 1157. Flavor House did not believe it could meet the 10% limitation by supplying more peanuts; it simply did not realize that there was a 10% requirement.

*Duty of Care*

■ .The government argues, however, that the "bad business judgment" was in Central Park's failure to ensure that Flavor House knew the specifications. This is not the traditional "business judgment" test, but simply another way to import a negligence or duty of care test into the doctrine.

Central Park's error might not have been reasonable. However, the reasonableness of the mistake is not relevant to the creation or discharge of the government's verification duty. The "contractor need not be free from blame. In all of the cases cited above the bidders were, in fact, guilty of egregious blunders." *Ruggiero v. United States*, 190 Ct.Cl. 327, 335, 420 F.2d 709 (1970). It is quite clear that the degree of care exercised by Central Park is not a factor in the doctrine of unilateral mistake. As the Armed Services Board of Contract Appeals has stated:

> Appellant's stupidity in bidding without reading the revised specifications does not forfeit relief because such foolishness or a variation thereof is common to most bidders who err in bidding and such conduct is of diminished importance in deciding whether to reform a contract.

*Minnesota Well Drillers*, ASBCA 26097, 82–1 BCA ¶ 15,539, 1981 WL 7222 (1981).

While the government would have the Court decide this case based on the battle of blunders, no case we have reviewed assesses equities. The very rationale of the doctrine is that it would be "bad faith" on the part of the government to take advantage of a bid it knows or has reason to believe is the product of a mistake. Put in tort terms, the policy focuses on the last clear chance of the government to prevent a "disastrous mistake", rather than a philosophy of comparative negligence.

This view also has a practical benefit. The government's obligation is clear and simple. If it suspects an error, it must ask. Far more difficult for the government (and the courts) would be the requirement to assess equities—that is to say, to evaluate the comparative negligence of the parties that produced the problem. This test would be espe-

cially onerous on the government, which would have no way of knowing from the appearance of the error whether it was obligated to inquire, or whether the obligation was negated by some measure of the negligence that produced it.

Finally, we must observe that the government would not necessarily prevail if we were to weigh comparative negligence. It, too, failed to exercise due care at a number of junctures, including its failure to attach the CID to the RFP, its failure to note it in Section J, its incorrect completion of the survey form, and the failure of five officials to read the bid package. Most serious of all, the government accepted a bid that did not conform to its RFP.

*Source of the Error*

We must, however, consider another aspect of the "nature of the mistake." Generally speaking, in the cases that involve the doctrine, the error was manifest by a dollar discrepancy between the contractor's mistaken bid, and what the government should have expected, either when compared to its estimate or to the other bids. Here, what put the government on notice was not the dollar amount of Central Park's bid, which was only some 10% lower than Sanfilippo's runner-up figure. It was, instead, the nut mix specifications sheet submitted by Flavor House. In addition, 48 C.F.R. § 14.407–1 requires the contracting officer to examine all bids for mistakes at the time the bids are opened. It does not direct the government to review post-bid supplemental information for error.

■ Even assuming the FAR relates solely to the time when the bids are opened and to mistakes of dollar figures, the doctrine's principles still apply in our case—an obvious error underlying the contractor's low bid, government notice of the error, and the fact that it would be unconscionable for the government to take advantage of the mistaken low bid. The policy is designed to prevent the government from overreaching by awarding a contract where it knows the contractor has made a significant mistake. This concern is relevant whether the government learns of the mistake through dollar bid information or otherwise. It is also irrelevant whether the government learns of the mistake when it opens the bids or some subsequent time prior to award. The government is acting in "bad faith" when it awards a contract knowing the contractor will have to act contrary or beyond its intent.

*Constructive Knowledge*

■ The central component to the unilateral mistake doctrine is that the government had knowledge, either constructive or actual, of the mistake the contractor has made. It is this knowledge which triggers the duty to act and the opportunity for contractor relief. *Connelly Containers, Inc. v. United States,* 7 Cl.Ct. 423 (1985).

There can be no question the government had at least constructive knowledge that Flavor House intended to provide a product not in conformance with the solicitation. When the government receives information, particularly where, as here, there is a cover letter identifying the information and indicating it is responsive to a government request, the government must be found to have knowledge of that information. As the Court has stated:

> [W]hat we are really concerned with is the overreaching of a contractor by a contracting officer when the latter has the knowledge, actual or implied as something he ought to know, that the bid is based on or embodies a disastrous mistake, and accepts the bid in the face of that knowledge.

*Ruggiero,* 190 Ct.Cl. at 335.

*Duty of Inquiry*

The government's knowledge of a mistake creates a responsibility to inquire of the contractor with specificity as to what the error may be. Given the government's constructive knowledge of Flavor House's intended product makeup, it had a duty to contact Central Park and inquire. The regulation could not be clearer:

> In cases of apparent mistakes and in cases where the contracting officer has reason to believe that a mistake may have been made, the contracting officer shall request from the bidder a verification of the bid, *calling attention to the suspected mistake.* 48 C.F.R. § 14.406–1. (Emphasis added)

The inquiry must be one that puts the contractor on notice as to its error. *Dakota Tribal Industries,* 34 Fed.Cl. at 596 (where there is an indication of mistake the government must verify bid calling attention to possible mistake). As the Court rhetorically asked in *BCM Corp.:*

> If the very purpose of the request for verification is to establish the good-faith of the contracting officer, can the request itself be in good faith if less than full disclosure is made to the bidder of all facts or circumstances which have led the contracting officer to suspect the possibility of error?

*BCM Corp.,* 2 Cl.Ct. at 610.

We also note here that the parties did not allocate the risk of mistake to the plaintiffs by agreement, and therefore the cases cited by the government for that proposition are inapposite. *Morris v. United States,* 33 Fed. Cl. 733, 747 (1995) (plaintiff bought property from government under purchase agreement that expressly provided that property was sold "as is"); and *Meek v. United States,* 26 Cl.Ct. 1357 (1992) (documents memorializing transaction stated that risk of title defects was on the purchasers). Furthermore, assignment of risk would not have trumped the government's responsibility to avoid making a contract where it knew, or should have known, of the plaintiffs' mistake.

*Rescission or Reformation*

The fifth test of *McClure* requires the contractor to prove what the proper bid should have been. Central Park has not done this, and it is difficult to see what relevance to our case such a revised bid might be. Central Park did not perform the contract and it is not entitled to money under the original or some revised figure. Clearly, proof of a revised bid figure makes sense only when the contractor has performed the contract and now seeks adjustment to compensate for its mistake. *Hamilton,* 711 F.2d at 1046; *P.T. Service Company,* supra.

The doctrine of unilateral mistake applies equally to rescission as to reformation, and it is to the former remedy we must now look. Central Park amended its complaint to include a request for rescission. Rescission voids the contract as if it had never been. In other words, rescission corrects the bidder's error and the government's failure to pursue it by canceling the defective agreement. That is the appropriate course here.

The government argues that the circumstances that followed the June 12 discovery bar Central Park from this remedy. When Mr. Di Babbo learned on June 12, 1995, of the apparent problem, he contacted Central Park to inform it that Flavor House was not meeting the contract requirements. Mr. Giesler advised the government that it would meet the contract deliveries by the required delivery date. However, Flavor House refused to produce the more expensive product at the contract price. Central Park missed the July 3, 1995, delivery date. Mr. Di Babbo made repeated calls to Mr. Giesler, but in vain. Frustrated, Ms. Aquino issued a show cause notice, still heard nothing, and ultimately terminated the contract for default.

There is no denying that Mr. Giesler and Central Park did not respond to this crisis in the most exemplary manner. Cooler heads might have negotiated a compromise solution embodying either a contract reformation or an equitable rescission. But when cooler heads do not prevail, that is what courts are for.

We do not believe that the policy behind the doctrine of unilateral mistake, that is, to prevent the government from taking advantage of known contractor errors, should turn on the behavior of the parties after the mistake is manifest. The doctrine contemplates rescission, that is, a termination of the contract in appropriate circumstances.

*The Hamilton Precedent*

The critical distinction between the two possible remedies of reformation and rescission is nowhere better illustrated than in *Hamilton.* The case offers important parallels to our own. Indeed, in some respects the contractor's case for relief was weaker than Central Park's, and the Navy's arguments were stronger. We review it at length.

Hamilton Enterprises was 1 of 31 contractors who bid on a Navy solicitation to privatize or out-source its food services at the

Naval Air Station near Memphis, Tennessee, the Navy's fourth largest such installation. Hamilton and every one of the other bidders quoted prices below the Navy's dollar estimate. Hamilton eventually won the contract, but within a month, found it was losing money. Its requests for equitable adjustments denied, Hamilton reduced its manhours to 456 per day, less than half of the 1,100 previously provided, with the Navy taking up the slack. Within 3 months, the contract was terminated for default, with Hamilton assessed nearly $170,000 in reprocurement costs. *Hamilton* 711 F.2d at 1039–1040.

After disposing of a preliminary jurisdictional issue, the Court turned to the reformation question. As part of its procurement process, the Navy had prepared manning charts based on its experience in providing the food services. When Hamilton's bid came in, it was substantially lower than most of the others. Suspecting an error, a Navy buyer wrote pointing this out, and noting that Hamilton had not provided a manning chart. But Hamilton was not sent a copy of the Navy's own manning charts and estimates. Hamilton affirmed its bid prices and submitted its manning charts, which were 30 percent of the Navy's estimates. Hamilton was subjected to a pre-award survey which used the company's manning estimates, but not the Navy's. Despite some Navy doubts that Hamilton could satisfy the contract with its low labor estimates, it won the contract. *Id.* at 1044–45.

The ASBCA found that the Navy was on notice of an error in the bid, that it had an obligation to verify the bid, and that its attempt to do so was inadequate. The Court agreed:

> On the basis of the record before it, the Board concluded that once Hamilton submitted its manning charts, which were grossly under the Government's estimate, the Navy was dutybound to request another verification which called attention to the suspected mistake and the reason for that suspicion.

*Id.* at 1045.

The opinion is somewhat obscure when it comes to identifying the precise anomaly that triggered the Navy's obligation to seek verification. It was clearly not the dollar level of Hamilton's bid—the next lowest and highest bids were within 1 percent. Moreover, the Navy had already pointed out that Hamilton's bid was far lower than most of the others.

What made the bid suspicious was the obvious source of the discrepancy—the manning estimates:

> The Board attached special significance to the Government's estimate of the manhours of labor required to perform the contract and we think this was proper. In view of the fact that the estimate was prepared by experienced Navy personnel who had first-hand knowledge of the manhours which would be needed to perform the various phases of the contract and the purpose for which it was to be used, the buyer should have surmised that there was an error in the bid because of the great disparity between Hamilton's estimate and the Government's manning charts. In the comparable situation involved in the bid submitted by Groves [a lower, but later disqualified bidder], the buyer suspected that there was an error in the bid because of the disparity between the bid and the Government's manning estimate, and Groves was asked to provide a verification of this estimate. The failure of the Navy to accord the same treatment to Hamilton is a crucial fact in this case.

*Ibid.*

The Court then turned to the appropriate relief, and found—as in our case—that Hamilton had not submitted adequate evidence of the intended bid to identify the parameters of a reformed contract. And, contrary to the ASBCA, the Court concluded Hamilton had not made the kind of mistake that would entitle it to the equitable remedy of reformation. Indeed, the Court noted it was not even immediately clear how the mistake had arisen:

> Hamilton's president, who prepared its bid, did not testify that he had made a mistake in its preparation. He did not point to any clerical or arithmetical error. He did not designate any portion of the specifications which he had misread or misinterpreted,

and, as a result, miscalculated the bid. The Government has correctly argued that the testimony of Hamilton's president shows that the price which Hamilton submitted was the price it intended to bid. *Id.* at 1047.

In fact, as it eventually was revealed, Hamilton's president had estimated the Naval Air Station (Memphis) labor requirements based on a comparison with those Hamilton was providing at the Navy facility at San Diego. As a result, the Court found "we cannot avoid the conclusion that the error in Hamilton's bid resulted from a mistake in judgment on the part of its president." *Id.* at 1048. In other words, Hamilton did not misread or misunderstand the contract's requirements; it simply misjudged how it could satisfy them. This was a classic mistaken business judgment which precluded Hamilton from obtaining the remedy reformation. The Court reversed the Board, which had granted this relief.

Nonetheless, the Court concluded that while reformation is not available for mistakes in judgment, rescission was appropriate. It disallowed the Navy's assessment of reprocurement costs, and ordered the payment of some $60,000; the Navy had withheld as part-payment of the reprocurement costs, but denied the excess cost claims by Hamilton.

The *Hamilton* case is important affirmation of our analysis in a number of respects. First, the evidence of error was not manifested in the low dollar bid from Hamilton. Rather, it was in the "specs;" the comparison of its labor estimates with the Navy's own manpower estimates. Second, rescission was ordered despite the contractor's clear mistake in business judgment—what precludes reformation does not preclude rescission. Third, the fact that Hamilton abandoned the contract and was terminated did not affect its relief from reprocurement costs. And, finally, the fact that the plaintiff sought but was denied reformation, did not preclude relief in the form of rescission.

### Superior Knowledge

For the sake of completeness, we offer a few observations on Central Park's alternate theory of "superior knowledge." From a contractor's perspective, this doctrine is the harsher uncle of unilateral mistake. While the unilateral mistake doctrine assumes a contractor failure and focuses on the government's responsibility, the superior knowledge doctrine denies relief in the event of a contractor failure.

Under the doctrine of superior knowledge, the government must disclose knowledge which is vital to the performance of a contract but which is unknown and not reasonably available to a bidder. The Federal Circuit has stated that the doctrine is generally applied to situations where: (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information. *Hercules Inc. v. United States,* 24 F.3d 188, 196 (1994); *American Ship Building Company v. United States,* 228 Ct.Cl. 220, 654 F.2d 75 (1981); and *Western Empire Constructors, Inc. v. United States,* 20 Cl.Ct. 668, 673–74 (1990).

Because we have found for the plaintiffs on their primary theory, we need not rule formally on this alternate theory. However, any reader of the facts we have set forth can easily estimate the odds of Central Park's prevailing on this doctrine.

### Conclusion

In this battle of blunders, both parties have urged theories which focus on the fault of the other. The unilateral mistake doctrine turns on the government's avoidable error, intentional or inadvertent, in awarding a contract premised on an apparent mistake. In the end, Central Park escapes liability for reprocurement costs because its negligence is outweighed by the government's obligation not to enter into a contract when it has constructive knowledge of that negligence.

We grant the plaintiff's motion for summary judgment, rescind the contract, and

find that Central Park was wrongfully assessed reprocurement costs.

IT IS SO ORDERED.