**LIEBHERR CRANE CORPORATION, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 86–903.**

United States Court of Appeals, Federal Circuit.

Feb. 5, 1987.

---

W. Stanfield Johnson, Crowell and Moring, Washington, D.C., argued for appellant. With him on the brief were Peter K. Levine and Luther Zeigler.

Ronald H. Clark, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. On the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, M. Susan Burnett, Asst. Director, and Van Teasley.

Before FRIEDMAN, DAVIS and EDWARD S. SMITH, Circuit Judges.

DAVIS, Circuit Judge.

Liebherr Crane Corporation (Liebherr) appeals from a decision of the Armed Services Board of Contract Appeals (ASBCA or Board), *Liebherr Crane Corporation,* 85–3 BCA ¶ 18,353 (1985), that upheld the contracting officer's denial of Liebherr's claim for price relief. We affirm.

## I.

The facts found by the Board, all supported by substantial evidence and the extensive and detailed ASBCA findings, show this: On February 13, 1976, the Great Lakes Branch, Northern Division, of the Naval Facilities Engineering Command (Navy), issued a competitive solicitation seeking bids for the construction of two 50–gross ton portal cranes, with an option to provide and secure an additional 50–gross ton portal crane. The request for proposals included a 98–page technical specification which set forth detailed design requirements.

Mr. Heinz Schiller, president of Liebherr, assumed responsibility for the preparation of Liebherr's proposal. There is no doubt that Schiller was careless in his perusal of the specification. Because he limited his examination to the principal performance requirements in the specification (3 or 4 pages out of 98), he overlooked certain special sections of substance which pertained to industry and military specification standards. The short of it is that Schiller's cursory examination convinced him that Liebherr's light-weight standard commercial crane, with minor modifications, would satisfy the Navy's design specifications. Accordingly, he formulated a bid based upon the approximate weight of Liebherr's standard Form 1500 crane (270 tons) multiplied by a factor of $4.00 per kilogram.[1] However, a careful reading of the specifications and the performance requirements would have disclosed the need for a much heavier crane. Although there were no

1. The formula Schiller used was apparently derived from a similar contract Liebherr had re-cently completed for General Dynamics.

explicit weight requirements prescribed by the specifications, in actual fact they required Liebherr to provide custom-designed cranes weighing between 705 and 786 tons each. Not surprisingly, Liebherr's bid of $3,725,600 was dramatically lower than the next lowest bid of $7,131,860.[2] Indeed, the Government's own estimate was $6,963,950, a figure which did not include a 24 percent escalation and 5 percent Washington state sales tax.

The Navy immediately noted the wide disparity between Liebherr's bid and the range of the other responsive proposals, and requested Liebherr to confirm its bid. (The discrepancies between the various bids and estimates were not then pointed out to Liebherr.) By telegram dated May 5, 1976, Liebherr responded:

> We confirmed [sic] herewith that all prices which we quoted to you under the ... solicitation ... are as intended and remain unchanged. Our prices and our proposal, as submitted, present full technical performance to all contracts, specifications as stated therein. We further inform you that we are complying with your request to submit in writing, evidence of our previous experience in accordance with Clause Number J–9 as stated in your solicitation. Please be advised that we have been building portal cranes since 1948, and that since 1948 we are one of the world's largest crane manufacturers.

Liebherr's confirmation failed fully to reassure the Navy. On two separate occasions, the Navy sought further verification of Liebherr's intent to honor its bid and perform the contract according to specifications. First, by letter dated May 14, 1976, the Navy invited all bidders to submit "a best and final offer" before May 25, 1976. Liebherr's response of May 20, 1976 reiterated the same prices quoted in its original proposal and even included an alternate proposal offering a *discount* of $30,000 per crane.

Because the submission of "best and final offers" did nothing to reduce the great disparity between Liebherr's price and the range of other bids, the Navy summoned Liebherr representatives, including Schiller, to a pre-award conference on May 27, 1976. Apparently, the intended purpose of the meeting was to determine whether Liebherr understood the specification requirements and was capable of performing.

During the meeting, Navy personnel reviewed four drawings and miscellaneous brochures furnished by Liebherr. In addition, the parties discussed certain technical matters including the design engineering requirements and several individual specification elements. Also, part of the meeting was devoted to discussion of the drawing submission requirements under the contract.[3]

Although the Navy's Procuring Contracting Officer previously had instructed Schiller to bring cost data to the conference, the latter failed to do so. Instead, he broke Liebherr's bid down into its component parts, assigning relative percentages to engineering, materials and labor. Schiller estimated the cost of crane erection alone to be 5 percent of the total cost ($60,000). When Navy personnel remarked that this was quite low, Schiller commented that an error of $10,000 to $12,000 for this component was relatively small when compared to the total amount of procurement involved.[4]

---

2. A proposal of $4,500,000 was rejected because it did not conform to the technical requirements of the specification.

3. Under the terms of the solicitation (and ultimately the contract), Liebherr was required to submit special drawings "in furtherance of the specification before proceeding with the work." Moreover, Liebherr was required to submit design and evaluation drawings of numerous types for approval prior to fabrication.

4. The parties have stipulated that at no time during this meeting did the Navy disclose to Liebherr that Liebherr's bid seemed unreasonably low or that the Navy had suspected that Liebherr's offer was the product of a mistake. Similarly, the Navy remained silent as to how Liebherr's offer compared with the other offers and the Navy's pre-solicitation estimate.

Based on the information obtained at that meeting, the Navy concluded that Liebherr had both the ability and intent to perform the contract in accordance with the specifications. This conclusion was bolstered in part by Schiller's emphatic reassurances during the course of the meeting that Liebherr intended to provide the crane as described in the specifications. On June 24, 1976, the Navy awarded the contract to Liebherr.

During the 15 months following the contract award, Liebherr submitted approximately 30 preliminary drawings. Nevertheless, the Navy was unable to discern Liebherr's intended crane design from these initial drawings, many of which were of poor quality, annotated in German and conflicted with one another. At one point, the Navy suspected that Liebherr was attempting to inveigle the Government into joint participation in the design effort, a duty explicitly reserved by the contract to Liebherr. Eventually, unable to determine whether the drawings submitted were merely proposed alternatives or intended for final review and approval, the Navy refused to accept any further informal drawings submitted by Liebherr.

By the fall of 1977, Schiller realized that Liebherr was going to lose money under the contract. As a result, he wrote to the Navy and admitted an unspecified "calculation error." According to that letter, in order for Liebherr to continue under the contract it was essential that the company obtain some price relief. The Navy responded to Schiller's letter by summoning Liebherr representatives to a meeting held on October 3, 1977.

During the course of that meeting, the Navy voiced its concern that, as matters stood, Liebherr would be unable to complete delivery of the cranes within the time frame set forth in the contract. Because of the contract's high defense priority, the Navy stressed the importance of timely completion of the contract and the serious consequences of default. When the Navy explained the default procedures and reprocurement costs for which Liebherr would be held accountable upon default, Liebherr learned for the first time the difference between its bid and that of the next low bidder. The Navy concluded the meeting by demanding that Liebherr submit in writing (prior to October 11) "a detailed analysis and schedule of events and actions in sequential format upon which the Navy . . . could reasonably be assured that the completion dates could be met."

By letter of October 17, 1977, Schiller informed the Navy that, notwithstanding the newly disclosed and sizeable differential in the bids, Liebherr intended to continue performance under the contract. However, due to alleged changes in the specifications by the Government, Schiller claimed that Liebherr was entitled to an "equitable adjustment in price as well as schedule." This letter precipitated additional discussions between the Navy and Liebherr which eventually culminated in a modification of the contract. Under the terms of the modification, Liebherr was given an extension of 5½ months during which to complete the contract. In return, the company released the Government from any and all claims arising out of the contract up to the date of the modification.

By the end of June 1979, Liebherr's crane design was submitted, reviewed and approved. On August 3 of that year, Liebherr filed a claim with the contracting officer for a price increase.[5] When the contracting officer denied its claim on January 15, 1980, Liebherr filed a timely notice of appeal with the ASBCA. Following a full trial, the Board denied Liebherr's claims in full.

## II.

■ Although both parties seem to agree that this case is governed by the

---

5. In submitting its claim, Liebherr elected to have the claim considered in accordance with the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.*, and certified its claim under that

Act and the requirements of § 813 of the Department of Defense Appropriation Authorization Act of 1979, Public Law No. 95–485.

principles announced in *United States v. Hamilton Enterprises, Inc.*, 711 F.2d 1038 (Fed.Cir.1983), each side distills differing rules from that decision.[6] According to Liebherr, *Hamilton* holds that, where a contract is the product of mutual fault, the government is precluded from enforcing the contract and the contractor is relieved of any liability for the government's reprocurement costs. In Liebherr's view, when the government insists upon continued performance despite mutual fault, *Hamilton* necessarily requires that the contractor be afforded relief. But Liebherr's reading of *Hamilton* misses the mark in several respects.

First, we emphasize that the remedy sought by Liebherr is reformation. Appellant seeks to alter the price terms of the contract to equate actual cost with the price set in Liebherr's low bid. Unfortunately for the contractor, this case does not involve the type of fault or mistake that entitles a bidder or contractor to rescission, reformation or other affirmative contract relief. Nor does Liebherr's characterization of this case as one involving "mutual fault" convert an obvious unilateral mistake of judgment into a mutual one.

Under *Hamilton*, "[a] contract will not be reformed because of a unilateral mistake in a bid unless the contractor establishes that the error resulted from a 'clear cut clerical or arithmetical error, or a misreading of the specifications.'" 711 F.2d at 1046. Moreover, "in such cases, the degree of proof demanded for reformation is higher than where rescission is requested. The contractor must establish by clear and convincing evidence what his bid price would have been but for the error." *Id.*

Those requirements are not met here. Liebherr's mistake is not classifiable as either "clerical" or "arithmetical." Surely, it cannot be said to have resulted from a "misreading of the specifications." To the contrary, Liebherr's errant bid clearly resulted from Schiller's gross negligence in failing to read and consider the specifications thoroughly. The distinction is crucial. If a contractor fails to interpret correctly various elements of the specifications, he has "misread" the specifications. If a misreading produces a mistake in bid, it may, in appropriate circumstances, furnish a basis for reformation. The price may be reformed, providing the contractor can establish by clear and convincing evidence what his bid would have been but for the error. Such relief does not extend, however, to mistakes of judgment on the part of the contractor or its representative. *Ruggiero v. United States*, 420 F.2d 709, 713, 190 Ct.Cl. 327 (1970).

Unlike other cases of egregious contractor blunders where reformation has been granted, there is no difference in this case between Liebherr's intended bid and the bid Liebherr actually submitted. On behalf of Liebherr Schiller bid exactly what he had decided to bid. In other words, he did not establish that he committed any clerical or arithmetical errors in preparing Liebherr's bid. Indeed, Schiller's naked assertion of an unspecified "calculation error" was never substantiated. Nor did he identify any portion of the specifications which he misread or misinterpreted causing him to miscalculate the bid. *See Hamilton*, 711 F.2d at 1047. By his own admission, he deviated from Liebherr's customary method of bid preparation in that he read only 3 or 4 pages of the 98–page specification and erroneously assumed that the contract could be performed utilizing a crane similar to Liebherr's standard crane. Liebherr was a very experienced enterprise and Schiller's underestimation of the complexity of the contract and the company's continued insistence upon using and adapting its own standard crane involved serious errors in business judgment. As the Board said, the contractor undertook a "conscious gamble with known risks" and thereby assumed the risks of its deliberate choice to

---

**6.** *Hamilton Enterprises* (to paraphrase its conclusion) held that that case was one of "mutual fault to the extent that neither party is entitled to recover on the claims asserted against the other" and that "[t]he court must let the chips lie where they fall." 711 F.2d at 1048.

use its own standard crane with various modifications in various important elements or components on the assumption that this would comply with "the mixture of design and performance requirements set forth in the Government specification." 85–3 BCA ¶ 18,353, at pp. 92,070–071.[7]

 It is well established that an erroneous bid based, like this one, upon a mistake in judgment does not entitle the contractor to reformation of its contract. *Hamilton,* 711 F.2d at 1048; *see also Aydin Corp. v. United States,* 669 F.2d 681, 685, 229 Ct.Cl. 309, (1982); *American Ship Building Co. v. United States,* 654 F.2d 75, 80, 228 Ct.Cl. 220 (1981); *National Line Co. v. United States,* 607 F.2d 978, 984, 221 Ct.Cl. 673 (1979). On that basis we refuse to indulge Liebherr's attempt to take advantage of its own gross neglect and choice in failing properly to examine and follow the specifications. The Board's finding that Liebherr committed an error of judgment is supported by substantial evidence and is legally correct.[8]

### III.

 Alternatively, Liebherr asserts entitlement to restitution based on its claim that the Navy employed coercive threats during the post-award meeting of October 3, 1977, forcing Liebherr to complete performance under duress.[9] Under controlling precedent, three elements are common to situations where duress has been found to exist: (1) one side involuntarily accepts the terms of another; (2) circumstances permit no other alternative; and (3) the circumstances are the result of coercive acts of the opposite party. *See, e.g., United States v. Bethlehem Steel Corp.,* 315 U.S. 289, 301, 62 S.Ct. 581, 588, 86 L.Ed. 855 (1942). There is no indication that Liebherr's acceptance of the Navy's insistence on performance was involuntary. In fact, Liebherr's internal memoranda openly acknowledge both fault and liability. Liebherr's predicament resulted from its own initial gross negligence in formulating its bid. To the extent Liebherr faced a Hobson's choice, it was the product of its own choice and blunder.

Most important, the record fails to disclose any improper coercion or duress by the Navy. The Navy merely insisted on its rights under the contract and reminded Liebherr of the severe consequences of default. Although "[a]n act the Government is empowered to take under law, regulation, or contract may nonetheless support a claim of duress if the act violates notions of fair dealing by virtue of its coercive effect," *Systems Technology Associates v. United States,* 699 F.2d 1383, 1387–88 (Fed.Cir.1983), there is insufficient basis for Liebherr's assertions of unfair circum-

---

7. The ASBCA likewise expressly found that the contractor's assurances (to the Government) that it would perform in conformance with the specifications were given "in awareness that appellant's estimators had not considered it necessary to review the entire specifications and to know all significant requirements applicable to the crane the Navy had specified." 85–3 BCA ¶ 18,353 at p. 92,070. The findings also show that Liebherr knowingly continued, even after the post-award meeting of October 1977, *supra,* to ignore certain contractual specifications.

8. The Board initially determined that the Government did not go far enough in alerting Liebherr to the facts showing the latter's mistake. We need not fully consider the correctness of that holding because we agree with the Board that, in any event, such a governmental breach could not permit Liebherr to obtain ref-

ormation on account of an error of judgment of the type existing here. *See Hamilton, supra,* 711 F.2d at 1045, 1047. However, we note that (a) the Government does not challenge the Board's findings on this point and (b) it appears from those facts that the Navy could and should very well have earlier informed Liebherr of the bids made by other bidders and of the Government's own estimates.

We also note that the Board found it unnecessary to consider the effect (on this reformation claim) of the release executed by the parties. *See* Part I, *supra.*

9. The ASBCA correctly found that, aside from the contention of duress, Liebherr's alternative claim was meritless. We do not separately discuss the aspects of that claim (other than duress) but we do agree with the Board's holdings on those issues.

stances here. The potential default was grave, the need for the cranes urgent, appellant repeatedly reassured the Navy that it could and would comply, the company was large and experienced, and the Government did not then realize the contractor's intent to supply a new modification of its standard crane (rather than fully to follow the contract specifications). The Board's rejection of the duress argument is amply supported by substantial evidence.

AFFIRMED.