**UNITED INTERNATIONAL IN-VESTIGATIVE SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 01–559 C.**

United States Court of Federal Claims.

March 28, 2003.

Alan M. Grayson, Grayson, Kubli & Hoffman, P.C., McLean, Virginia, for plaintiff (James A. McMillan, of counsel).

Opher Shweiki, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant, with whom were Harold D. Lester, Jr., Assistant Director, David M. Cohen, Director, and Robert D. McCallum, Jr., Assistant Attorney General.

1. In Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss and Motion for Summary Judgment, Defendant withdrew its motion to dismiss on grounds that Plaintiff had not properly filed a claim under the Contract Disputes Act. Defendant's counsel confirmed with-

## OPINION

DAMICH, Chief Judge.

### I. Introduction

This case involves a claim of breach of contract, pursuant to the Contract Disputes Act, 41 U.S.C. § 601, *et seq.*, arising out of a contract with the United States Marshals Service (USMS) to provide Court Security Officers (CSOs) for three federal judicial circuits. Plaintiff (UIIS) seeks damages for certain vacation benefits and federal and state unemployment taxes (FUTA and SUTA, respectively) it paid on behalf of the CSOs. Pending before the Court is Defendant's Motion for Summary Judgment.[1] For the reasons stated below, Defendant's Motion is GRANTED.

### II. Background

In early March 1999, Plaintiff entered into three contracts (collectively, the contract) with the USMS to provide CSOs for three federal judicial circuits (Third Judicial Circuit, contract no. MS–99–D–0001; Fourth Judicial Circuit, contract no. MS–99–D–0043; and Ninth Judicial Circuit, contract no. MS–99–D–0035), pursuant to a Request for Proposals (RFP) issued on June 22, 1998 (Solicitation No. MS–98–R–0008). Pl.'s Compl. at ¶ 6; Pl.'s Opp'n to Def.'s Mot. Summ. J. (hereinafter Pl.'s Opp'n) at 2. Although the RFP originally contemplated a one-year base contract period, the base period was subsequently changed from one year to six months due to delays in the date of the contract award. Def.'s Mot. Summ. J. at 13. In any event, the RFP noted that the "base contract period" was from "the effective date of the contract award, as specified on the contract award document" through September 30, 1999. Def.'s Supp.App. at 37.[2]

Modification A003 of the RFP, dated July 24, 1998, Def.'s Supp.App. at 1, provided that,

drawal of its motion to dismiss at oral argument. Tr. 4:2–12, January 29, 2003.

2. "Def.'s Supp.App. at ____" refers to the referenced page(s) of the appendix accompanying Def.'s Reply to Pl.'s Opp'n.

for the base contract "period" as well as for each of four option "periods," the calculation of the bidder's overall price should be premised, *inter alia*, on a 2008–hour base year for each full-time CSO for category I services.[3] Def.'s Supp.App. at 34–35; Pl.'s Compl. at ¶ 16. The contracts themselves, once awarded to UIIS, provided for a "performance start date" of April 1, 1999, with a "base year" period of April 1, 1999 through September 30, 1999, and four "option years," the first of which would prospectively run from October 1, 1999 through September 30, 2000. Def.'s App. at 6, 17, 22.[4]

In each of the three judicial circuits for which Plaintiff was awarded the contract, Plaintiff replaced a contractor that had been providing CSO services under "predecessor contracts."[5] According to Plaintiff, after the first pay period in April 1999, incumbent CSOs in the three judicial circuits at issue notified UIIS that they had not been paid by the predecessor contractors for vacation time accrued[6] under the predecessor contracts. Pl.'s Opp'n at 5; Pl.'s App. at 2.[7] The CSOs apparently threatened to desert their positions unless UIIS paid them for such previously accrued vacation time. Pl.'s App. at 3. Fearful that, in such eventuality, UIIS would be held in default under the contract, UIIS paid the incumbent CSOs for the vacation pay accrued under the predecessor contracts. Pl.'s Opp'n at 6; Pl.'s App. at 3. On November 4, 1999, Plaintiff sought an equitable adjustment, pursuant to the Disputes clause of the contract, for reimbursement of its expenditures for the vacation pay accrued under the predecessor contracts. Def.'s App. at 28–31. The USMS denied any obligation to reimburse Plaintiff for such payments. Def.'s App. at 33.

In addition to Plaintiff's claim for damages for vacation pay expenditures, Plaintiff seeks an adjustment for its alleged overpayment (or more accurately, under-reimbursement) of FUTA and SUTA. Such unemployment taxes are generally calculated as a small percentage of a capped amount of income (e.g., FUTA was calculated in 1999 as 0.8% of the first $7,000 of income). Pl.'s Compl. at ¶ 17. Modification A003, in § L–4(c)(2), stipulated, however, that the "pricing schedule" in each bidder's "Business Proposal" shall propose "for each location and all required skill categories, *a fixed hourly rate*, inclusive of wages, overhead, general and administrative expenses, and profit." Def.'s Supp.App. at 21 (emphasis added). The proposed hourly rate was to be supported by an itemized breakdown that included, *inter alia*, applicable taxes. Def.'s Supp.App. at 22–23. Furthermore as to taxes, the contract incorporated 48 C.F.R. § 52.229–3, entitled "Federal, State, and Local Taxes," which provides that the "contract price includes all applicable Federal, State, and local taxes and duties." Def.'s Supp.App. at 40.

Thus, Plaintiff was obliged to calculate its fixed hourly rate proposal over 2008 hours even while the "base year" for the initial period of the contract was actually 1004 hours for the six months from April 1, 1999 to September 30, 1999. Given the front-loaded nature of an employer's obligation to pay federal and state unemployment taxes, UIIS argues that it paid a full year's amount[8] of FUTA and SUTA taxes per CSO

---

**3.** The RFP, and the resultant contracts, defined "Category I Services" as "Court security services performed between the hours of 6:00 a.m. and 6:00 p.m. local time, Sunday through Saturday, except Holidays." Def.'s App. at 4, 14, 19.

**4.** "Def.'s App. at _____" refers to the referenced page(s) of the appendix accompanying Def.'s Mot. Summ. J.

**5.** The contractors that had provided CSO services in the three judicial circuits via contracts that terminated on March 31, 1999, just prior to the effective starting date of the UIIS contracts, are referred to as "predecessor contractors" (or "incumbent" contractors) and the contracts under which they had provided such services are referred to as "predecessor contracts." The CSOs who worked for the predecessor contractors and whose service carried over under UIIS are referred to as "incumbent CSOs."

**6.** Under 29 C.F.R. § 4.175 (Part 4—Labor Standards for Federal Service Contracts), employees who work in lieu of taking accrued vacation time are *entitled to payment for such time worked*. See Pl.'s App. at 7.

**7.** "Pl.'s App. at _____" refers to the referenced page in the appendix accompanying Pl.'s Opp'n.

**8.** The record is unclear whether Plaintiff actually paid the "full amount" of the unemployment taxes per CSO. At oral argument, Plaintiff's

within the six-month "base year," but was reimbursed under the contract (i.e., the hourly rate times 1004 hours) for less than the amount it paid out because the hourly rate itself spread the unemployment tax obligation over 2008 hours.

The USMS denied Plaintiff's request for an adjustment for unemployment taxes on the grounds that "UIIS was fully aware that the base year would not be a full 12 month period." Def.'s App. at 33.

### III. Discussion

This Court possesses jurisdiction over this action pursuant to the Contract Disputes Act and 28 U.S.C. § 1491(a)(1).

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that might affect the outcome of the suit. *Id.* at 248, 106 S.Ct. 2505. A material fact is genuine if the evidence is such that a reasonable jury or trier of fact could return a verdict in favor of the non-moving party. *Id.* Initially, the moving party bears the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party can meet its burden by demonstrating the absence of issues of material fact or showing the absence of evidence to support the non-moving party's case. *Id.* If the moving party makes such a showing, the burden shifts to the non-moving party to present such evidence. *Id.* at 324, 106 S.Ct. 2548. The non-moving party must present a foundation for facts sufficient to support a verdict in its favor, with all reasonable inferences resolved in its favor. *Arthur A. Col-*

*lins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1047–48 (Fed.Cir.2000).

A. The Contract Clearly Placed Responsibility for Payment of Previously Accrued Vacation Time on the Predecessor Contractors; Nothing in the Contract Obligates Defendant to Reimburse Plaintiff for Gratuitous Payment of Previously Accrued Vacation Time.

At issue before the Court is the extent of Plaintiff's obligation, if any, under the contract to pay the incumbent CSOs for vacation time accrued under the predecessor contracts and whether it has a valid claim for reimbursement by Defendant for such payments.[9] Plaintiff's obligation regarding such previously accrued vacation time is informed by the contract's incorporation by reference of the Service Contract Act (SCA) of 1965, as amended, 41 U.S.C. § 351, *et seq.*, and its implementing regulations, Federal Acquisition Regulation (FAR) 52.222–41. Def.'s Supp.App. at 23 (Modification A003, § L–5); Def.'s Supp.App. at 38, 40 (Contract No. MS–99–D–0038). FAR 52.222–41(b) makes clear that the UIIS contract is subject to the provisions of the SCA "and regulations of the Secretary of Labor (29 CFR part 4)." Similarly, Modification A003, § L–5, provided that "[a]ny questions regarding the extent of the obligation of the Contractor under the Act should be addressed to the U.S. Department of Labor." Def.'s Supp.App. at 23.

Thus, as Plaintiff acknowledges in its brief opposing summary judgment, Pl.'s Opp'n at 3, U.S. Department of Labor ("DOL") regulation 29 C.F.R. § 4.173(d) focuses liability for unpaid vacation benefits on whoever is the employer when the vacation time is accrued:

The liability for an employee's vacation is not prorated among contractors unless specifically provided for under a particular fringe benefit determination. The contrac-

---

counsel acknowledged that unemployment taxes are paid from the beginning of a calendar year. If that were the case, inasmuch as UIIS took over the contract at the beginning of the second quarter of 1999, it would suggest that the predecessor contractors paid some of the unemployment taxes for that calendar year. Neither Plaintiff's counsel nor Defendant's counsel had

anything to add to the Court's inquiry on this point. Tr. 37:24—38:18. January 29, 2003.

**9.** UIIS's claims for vacation benefits accrued *during* the base year of the contract are not in dispute. Tr. 5:5–22, January 29, 2003.

tor by whom a person is employed at the time the vacation time vests, i.e., on the employee's anniversary date of employment, must provide the full benefit required by the determination which is applicable on that date.

29 C.F.R. § 4.173(d)(1).

The vacation benefit clearly vests *only* on the anniversary date:

> For example, an employee ... was first hired by a predecessor contractor on July 1, 1978. July 1 is the employee's anniversary date. The predecessor's contract ended on June 30, 1979, but the employee continued working on the contract for the successor. Since the employee did not have an anniversary date of employment during the predecessor's contract, the predecessor would not have any vacation liability with respect to this employee. However, on July 1, 1979 the employee's entitlement to the full vacation benefit vested and the successor contractor would be liable for the full amount of the employee's vacation benefit.

*Id.*

In addition, RFP Modification A004, acknowledged in both parties' briefs, incorporated questions from bidders and USMS's answers, including Question No. 121:

> "Will the outstanding benefits (vacation, sick time, etc.) due the incumbent ... Court Security Officers be paid to the contractor by the incumbent contractor, if there is a change in contractors in each of the circuits.
>
> Answer: The incumbent contractor must compensate employees for accrued benefits. Accrued benefits do not transfer from one company to another."

Pl.'s App. at 88–89 (RFP MS–98–R–0008, Modification A004).

Astonishingly, Plaintiff even admits in its Complaint that "UIIS was liable to the employee *only* for the benefits accrued *after* UIIS began performance of the contract" and that "UIIS informed each of [the incumbent CSOs] that UIIS was responsible *only*

for the vacation benefit that accrued *after* UIIS began performance." Pl.'s Compl. at ¶¶ 11, 13 (emphases added). Moreover, citing DOL regulation 29 C.F.R. § 4.173(d)(1), Plaintiff's brief in opposition to Defendant's motion for summary judgment noted, "the governing DOL regulation made UIIS liable for 'the full amount of the [incumbent] employee's vacation benefit,' *depending on the employee's anniversary date*." Pl.'s Opp'n at 23 (emphasis added).

Despite the acknowledgments and admissions above, Plaintiff's claim for reimbursement of its payment of previously accrued vacation benefits rests on three allegedly overriding grounds: 1) the Service Contract Act itself holds the successor contractor liable to pay such benefits; 2) Plaintiff was entitled to rely on assurances in the RFP, as clarified by Modification A004, and on Defendant's legal responsibilities over both predecessor and successor contractors, to ensure that the predecessor contractors would *in fact* have paid the vacation benefits which the incumbent CSOs had previously accrued by the time UIIS succeeded to the contract; and 3) the DOL subsequently advised UIIS that the proper resolution would be for the USMS to assess the predecessor contractors for their failure to pay the accrued vacation benefits and utilize that offset to compensate UIIS. None of these arguments is sound.

1. The Service Contract Act Does Not Hold The Successor Contractor Liable If the Predecessor Contractor Does Not Pay Accrued Benefits.

 FAR 52.222–41, implementing the SCA, provides that a contractor subject to the Act must provide employees fringe benefits "in accordance with the wages and fringe benefits determined by the Secretary of Labor, or authorized representative, as specified in any wage determination attached to this contract." FAR 52.222–41(c), Pl.'s App. at 15. The same regulation, in ¶ (f), entitled "Successor Contracts," provides that, for employees previously covered by a collective bargaining agreement,[10]

---

10. E.g., in the Fourth and Ninth Judicial Circuits, collective bargaining agreements governed CSO wages and benefits. Pl.'s Opp'n at 3.

neither the [Successor] Contractor nor any subcontractor under this contract shall pay any service employee performing any of the contract work (regardless of whether or not such employee was employed under the predecessor contract), less than the wages and fringe benefits provided for in such collective bargaining agreement, to which such employee would have been entitled if employed under the predecessor contract, including accrued wages and fringe benefits . . . .

FAR 52.222–41(f), Pl.'s App. at 17.

In short, Plaintiff construes the above language to mean that, regardless of the predecessor contractor's obligation to pay for previously accrued vacation benefits, if in fact the predecessor contractor does not fulfill its obligation, the successor contractor must do so.[11] Plaintiff, however, overstates the import of these provisions. They merely confirm that, if a contractor succeeds to a contract, he must maintain the level of wages and benefits already in place, not that he then takes on legal responsibility for obligations over which the predecessor contractor has defaulted. Plaintiff cites no case law or other regulatory support for its interpretation of these provisions. Given the specificity within the SCA regarding the mechanism for enforcement of its provisions (addressed *infra*) and the clarity of 29 C.F.R § 4.173(d)(1) as to the accrual of vacation time liability, Plaintiff's argument in this respect is ineffectual.

### 2. Plaintiff Was Never Assured that the Predecessor Contractors Would *In Fact* Pay the Previously Accrued Benefits.

■ Plaintiff reads too much into the RFP answers to Questions No. 121 and 132 incorporated in Modification A004. Plaintiff would have the Court parlay RFP answers that restate the legal responsibilities of the predecessor contractors into assurances by Defendant that such predecessor contractors would in fact fulfill their obligations. The USMS, however, did not and could not make such assurances because of the strict administrative scheme under the SCA for aggrieved employees to seek recovery for unpaid benefits.

In addition to Question No. 121 and its answer, recited *supra,* Question No. 132 asked:

We need to ask [the] C[ontracting] O[fficer] to put something [into the] RFP [about] how outgoing contractors are to handle leave, etc., for CSO's staying with [the] new company.

The response was:

Incumbent contractors must settle earned leave and other accrued benefits with their employees. Accrued leave and benefits do not transfer to a successor contractor.

*Id.*

In construing these questions and answers as a warranty on the part of the government that the previously accrued benefits would in fact be paid ("The government went further than that and said that they in fact would be paid."),[12] Plaintiff seeks to place their construction in a more expansive context. It variously analogizes the apparent fact that the vacation benefits had not been paid by the time UIIS succeeded to the contract to "in effect, a differing site condition, if you will"[13] or at least to a material change in the contract subject to compensation under the Changes clause.[14] In their plain language, however, these answers address only the legal obligation of the predecessor contractors and do not address the factual question whether those contractors would or would not perform as required. The answers certainly do not constitute a warranty by the USMS to Plaintiff.[15]

---

**11.** "It's not necessary for the contracting officer to direct UIIS to pay. The regulation itself tells you what to do, and the regulation tells you that[, if] the predecessor contractor doesn't pay it[,][t]hen you have to pay it." Tr. 29:12–15, January 29, 2003.

**12.** Tr. 10:18–20, January 29, 2003.

**13.** Tr. 11:25—12:1, January 29, 2003.

**14.** Tr. 17:14–19, January 29, 2003.

**15.** See *Paccon, Inc. v. United States*, 185 Ct.Cl. 24, 34, 399 F.2d 162 (1968) ("It is almost impossible to stretch the contract article—phrased primarily in terms of the contractor's obligations, not the defendant's—to cover an unusual as-

■ Under the SCA, pursuant to FAR 52.222–1 ("Notice to the Government of Labor Disputes"), UIIS notified the USMS contracting officers of the CSOs' demands. The USMS responded that the dispute was between the CSOs and the predecessor contractors and advised UIIS to contact the Department of Labor. Plaintiff argues that such a limited response by the USMS to the vacation dispute was "inequitable and unconscionable" [16] and an abdication of its responsibility under the case precedent of *Paccon, Inc. v. United States,* 185 Ct.Cl. 24, 399 F.2d 162 (1968) and *Hensel Phelps Constr. Co.,* 74–2 B.C.A. ¶ 10,728, 1974 WL 1511 (May 20, 1974). Plaintiff acknowledges that there was never a representation on the part of the government—at the time the CSOs threatened to desert their position—that UIIS should pay the previously accrued vacation benefits and that the government would later reimburse it.[17] Plaintiff nonetheless relies heavily on these two cases for the proposition that the government had an affirmative obligation to assist UIIS in its efforts to maintain CSO continuity.

In *Paccon,* the plaintiff negotiated a fixed-price contract with the Army Corps of Engineers for the construction of houses, and the pads on which they stood, on two sites in Okinawa within a fixed time-frame. The plaintiff understood that a separate contract was to be awarded to another contractor for site grading, installation of utilities, roads, and sidewalks, and that the sites had to be properly graded before plaintiff could begin its construction of the houses. Because of its dependence on the timely work of the other contractor, plaintiff obtained a promise from the contracting officers that the defendant would impose a schedule of priorities on the other contractor sufficient to enable plaintiff to meet its own contractual obligations. The other contractor, however, could not keep up with the schedule and plaintiff's work was, accordingly, late. Plaintiff thereupon submitted a claim for modification of its contract, seeking compensation for increased costs brought about by delays caused by the second contractor.

The court noted that, while the government's promise was "less than that of an absolute guarantee," the United States could "incur liability toward the disfavored contractor in a 'two contractor situation' *where the Government is at fault in some way." Paccon,* 185 Ct.Cl. at 34, 399 F.2d 162 (emphasis added). The contracts of both contractors contained a clause obligating them to cooperate with other contractors and with the government, as directed by the contracting officers, and neither to commit nor permit any act interfering with the performance of work by other contractors.[18] Although the government had in fact established a schedule of priorities for the second contractor, the question was whether setting up that schedule, without any action to enforce it, was sufficient to complete the government's obligation to plaintiff. In holding for plaintiff, the court noted that "the Government's representative gave a promise which in our view can only be construed as obligating the Government to use reasonable efforts, *under its power of control,* to make [the second contractor] comply with a proper priority schedule." *Id.* at 38, 399 F.2d 162 (emphasis added).

In *Hensel Phelps,* the contract in question was for the construction of a bridge in a remote area of Idaho, to which (as all parties agreed) there was only one "all-weather," year-round access road. The Corps of Engineers Board of Contract Appeals found that another contractor, responsible for clearing the road, grading it, and cleaning its culverts, had damaged the road base in the fall of 1970. When the first contractor sought to use the road during the following spring, it had to undertake restoration of the road's rock base in order to gain access to the bridge site. It sought compensation for hauling the rock and restoring the road base.

sumption by the Government of responsibility without fault for the actions, not of its own servants, but of an independent contractor.").

16. Pl.'s Opp'n at 24.

17. Tr. 15:23—16:3, January 29, 2003.

18. Significantly, by virtue of these clauses in both contracts, the Court noted that "[t]he Government would thus have the power to exercise control over [the second contractor] in the aspects important to plaintiff's performance." *Id.* at 37, 399 F.2d 162.

In complaining to the Corps' area engineer about damage to the road, the contractor was advised that its claim lay against the other contractor, rather than against the government. On appeal, in holding for Hensel Phelps, the BCA cited the clearing contractor's obligation in its contract to protect from damage existing improvement and utilities in its work site and the provision that "[i]f the contractor fails or refuses to repair any such damage promptly, the contracting officer may have the necessary work performed and charge the cost thereof to the contractor." *Hensel Phelps*, 74–2 B.C.A. ¶ 10,728. The BCA further noted, "This Board has held that the government cannot ignore the necessities of one contractor's performance in its administration of the contract of another contractor." *Id.* (citation omitted).

These cases, which are the heart of Plaintiff's claim for reimbursement of its payment of the previously accrued vacation benefits, are inapt. First, the USMS made no warranty that the predecessor contractors would *in fact* have paid out the vacation benefits for which they were responsible. Second, the USMS never advised Plaintiff to pay the benefits the CSOs demanded, nor that the government would reimburse it for such payments. Third, there was never a change made in the contractual obligations of either the predecessor contractors or UIIS, their successor contractor; so Plaintiff encountered no "differing site condition." Finally, Plaintiff's reliance on *Paccon* and *Hensel Phelps* ignores the administrative stipulations of the SCA.

The SCA provides that, where a contractor—such as allegedly the predecessor contractors here—fails to pay the wages or fringe benefits due under its contract, such payment as is due under the contract, or under "any other contract between the same contractor and the Federal Government," may be withheld and "*shall be paid directly to the underpaid employees.*" 41 U.S.C. § 352(a) (emphasis added). Only the head of the federal agency in question or the Secretary of Labor are authorized to carry out the above provision, in accordance with regulations prescribed pursuant to section 353 of the same title.[19] 41 U.S.C. § 352(b). The regulations, outlined in 29 C.F.R. Part 4, authorize the Secretary, for example, to "hold hearings and make decisions based upon findings of fact as are deemed to be necessary to enforce the provisions of the Act." 29 C.F.R. § 4.189.[20]

The administrative scheme as outlined in the SCA does not allow for suit by a successor contractor against the agency for violations on the part of a predecessor contractor, nor for suit by the aggrieved employees directly against either the successor or predecessor contractors. *See, e.g., District Lodge No. 166, Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO, v. TWA Serv., Inc.*, 731 F.2d 711, 715 (11th Cir.1984) ("Congress did not intend to authorize private suits to enforce the [Service Contract] Act"); *accord Misc. Serv. Workers, Drivers & Helpers, Teamsters Local # 427 v. Philco–Ford Corp.*, 661 F.2d 776, 779 (9th Cir.1981). Rather, the aggrieved employees must make their complaint directly to the DOL. As Defendant has appropriately pointed out, the RFP was explicit that the contract was subject to the SCA and that "[a]ny questions regarding the extent of the obligation of the Contractor under the Act should be addressed to the U.S. Department of Labor." Modification A003, § L–5, Def.'s Supp.App. at 23.

In light of the requirements of the SCA, the USMS had no discretion to authorize

---

19. Defendant's reply brief overstates the Secretary of Labor's right of enforcement as "exclusive." Def.'s Reply to Pl.'s Opp'n at 6. Despite Defendant's citation to two United States District Court cases that describe the Secretary's right of enforcement as exclusive, *Rodriguez v. Mason Tech., Inc.*, 931 F.Supp. 114, 118 (D.Puerto Rico 1996) and *Oji v. PSC Envt'l Mgmt. Inc.*, 771 F.Supp. 232 (N.D.Ill.1991), 41 U.S.C. § 352(b) plainly authorizes either "the Federal agency head or the Secretary" to carry out the provisions of the section.

20. None of the relatively time-consuming administrative steps pursuant to these regulations would have availed Plaintiff in April 1999. In Plaintiff's haste to avoid a CSO walkout, it determined unilaterally that it should pay the previously accrued vacation benefits without USMS authorization and to seek reimbursement after the fact. See Pl.'s App. at 3.

Plaintiff to pay the vacation benefits in dispute nor to warrant reimbursement after the fact. Unlike *Paccon* and *Hensel Phelps* where the SCA was not at issue, the USMS had no "control" over the predecessor contractors other than to advise the CSOs to refer the matter to the DOL for resolution. To the extent Defendant had other, ongoing contracts with the predecessor contractors, it could only—upon findings of fact after notice and hearings—withhold payment under those other contracts in order to make compensation *"directly to the underpaid employees,"* not to UIIS. 41 U.S.C. § 352(a) (emphasis added). The USMS did not "ignore the necessities of" UIIS's performance, rather it advised Plaintiff that it was not responsible for the previously accrued benefits and that the DOL was the avenue for resolution of the dispute.

> 3. There is No Authority for Defendant to Assess the Predecessor Contractors in Order to Reimburse Plaintiff.

On February 4, 2000, in a letter to the USMS, Plaintiff wrote that it had "discussed" the matter with DOL and was advised, presumably verbally, that Plaintiff had no authority to "deduct all over payments on the accrual vacations paid to the CSO[s] which should have been paid by the incumbent contractor." Pl.'s App. at 93. In that letter, Plaintiff also represents that DOL advised that "only the agency can do an off-set for the monies that [UIIS] had to pay" for the previously accrued vacation time. Pl.' App. at 94. Plaintiff's letter is self-serving in its rendition of whatever it was that DOL advised and is unaccompanied by any written statement from DOL. In any event, it has already been established, *supra*, that Plaintiff did not "have to" pay the CSOs for the disputed vacation time. To the contrary, UIIS was on notice via the RFP and the advice of the USMS at the time of the dis-

pute that the obligation was not Plaintiff's, but that of the predecessor contractors.

At oral argument, Plaintiff's counsel expanded on this one-sided correspondence, arguing that DOL's alleged advice after the fact constituted an admission "that the proper procedure is an offset" against the predecessor contractors and "that the logical conclusion would be that the government turn over those monies to UIIS."[21]

As previously addressed, however, the SCA provides no authority whatsoever for resolution of the vacation pay dispute by reimbursement of Plaintiff's gratuitous payment to the CSOs. The SCA provides only that, where a contractor—such as allegedly the predecessor contractors here—fails to pay the wages or fringe benefits due under its contract, such payment as is due under the contract, or under "any other contract between the same contractor and the Federal Government," may be withheld and *"shall be paid directly to the underpaid employees."* 41 U.S.C. § 352(a) (emphasis added).

None of Plaintiff's arguments can withstand the clear import of the RFP, the contracts themselves, and the SCA. There are no material facts in genuine dispute regarding Plaintiff's claim for reimbursement of its payment of the previously accrued CSO vacation benefits. Defendant is entitled to summary judgment on this issue.[22]

> B. The Contract Required Incorporation of All Taxes in the Bidder's Fixed-Unit Price; Plaintiff is Not Entitled to Reformation of the Contract on the Grounds of Mistake.

As discussed in Part II above, the RFP and the contracts established that it was the contractor's responsibility to incorporate its liability for all applicable taxes into its fixed-rate bid. Def.'s Supp.App. at 40 (Contract § I–7, incorporating by reference 48 C.F.R. § 52.229–3, entitled "Federal, State, and Lo-

---

21. Tr. 66:8—67:16, January 29, 2003.

22. It is unnecessary to address Defendant's additional argument that Plaintiff's claim on this issue is barred by accord and satisfaction. At oral argument, Defendant's counsel admitted that "additional discovery could illuminate," and may be necessary to address, the question of the par-

ties' intent to waive claims in the course of other, post-contract modifications. Tr. 34:13—35:16, January 29, 2003. As Plaintiff's counsel rightly pointed out, in the context of accord and satisfaction, the issue of intent does not normally lend itself to resolution by summary judgment.

cal Taxes"). The contract required the USMS to pay UIIS "[o]nly for the number of hours actually performed . . . ." at the fixed hourly rates. Def.'s Supp.App. at 44 (Contract § G–6). Furthermore, the proposals were advertised as "indefinite-quantity indefinite-delivery and time-and-materials contracts, with fixed unit prices." Def.'s Supp. App. at 23 (Modification A003). *See also* Def.'s Supp.App. at 47 (Contract § I–6); Def.'s Supp.App. at 39 (Contract § I–7, incorporating by reference 48 C.F.R. § 52.216–22, entitled "Indefinite Quantity").

Plaintiff acknowledges in its opposition to summary judgment that the purpose of the RFP's direction to bidders to utilize 2008 hours for its base period bid was "to give [the] USMS a common basis for evaluating offers," Pl.'s Opp'n at 26, and cites the general rule that an "RFP, like any contract, must be read in light of its purpose and consistently with common sense." *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1380 (Fed.Cir.2000). From Plaintiff's perspective, because the original solicitation was based on a 12–month year and was structured so as to allow incorporation of all applicable taxes in a bidder's price, it was evidently the intent of the RFP to compensate the successful bidder for all such taxes, including unemployment taxes. Thus, noting that § G–8 of the contract, entitled "Post-Award Price Adjustment Procedures to be Done in the Base Year Only," allows for post-award adjustments for "actual wages and benefits," Pl.'s App. at 85, Plaintiff maintains that "the RFP gave UIIS no reason to believe that USMS would treat FUTA and SUTA differently from CSO wages and benefits." Pl.'s Opp'n at 26–27. Such argument is fanciful, for Plaintiff completely ignores the plain language that follows in § G–8: "The *taxes,* other direct costs, indirect costs, profit, etc. will remain fixed as proposed and will be added to the adjusted actual wages and benefits." Pl.'s App. at 85 (emphasis added).

■ The real question is whether the UIIS bid, spreading FUTA and SUTA taxes over 2008–hours as directed by the RFP and the contract (when the six-month, 1004–hour base "year" of the contract provided for reimbursement on a fixed hourly rate), amounts to a mistake for which a court may grant reformation. Although parties to a contract are generally bound by its terms, *Giesler v. United States,* 232 F.3d 864, 869 (Fed.Cir.2000), the law allows for an equitable adjustment in limited circumstances if a party's proposal is based on a mistake of which the government had, or should have had, knowledge. "[I]f the government has knowledge, or constructive knowledge, that a contractor's bid is based on a mistake, and the government accepts the bid and awards the contract despite knowledge of this mistake, then a trial court may reform or rescind the contract." *Id.* Bid errors that result from clear cut clerical or arithmetic errors or a misreading of the specifications are the kind of excusable mistake that allows relief. *Liebherr Crane Corp. v. United States,* 810 F.2d 1153, 1157 (Fed.Cir. 1987). Mistakes of judgment, on the other hand, do not qualify for such relief. *Id.*

■ Plaintiff's alleged mistake here is clearly not of the clerical or arithmetic kind. Thus the narrower inquiry is whether UIIS's mistake was in the nature of a misreading of the specifications (or, as the court in *Liebherr* also put it, a misinterpretation causing the contractor to miscalculate the bid). *Id.* The court described a "misreading" as "fail[ing] to interpret correctly various elements of the specifications." *Id.*

On a literal basis, then, UIIS did *not* misread the specifications. It did exactly what the contract called for: it calculated its various CSO costs on a 2008–hour basis and bid a fixed hourly amount. Moreover, it knew from Modification A003 that the "base contract period" was to be from "the effective date of the contract award, as specified on the contract award document" through September 30, 1999. Def.'s Supp.App. at 37. It submitted its final proposal revisions in February 1999. Def.'s Mot. Summ. J. at 13. The contracts themselves, once awarded to UIIS, provided for a "base year" period of April 1, 1999 through September 30, 1999. Def.'s App. at 6, 17, 22. Thus, Plaintiff was clearly on notice that the 2008–hour cost calculation was not consistent with the base period of the contract, for which it would be

reimbursed for the actual hours of CSO employment based on its fixed hourly bid.[23] If its hourly calculation under-compensated it for applicable unemployment taxes, it could conceivably have adjusted its profit margin or other more flexible cost elements accordingly. As Defendant has properly noted, the UIIS contract was an indefinite quantity, indefinite delivery kind, not a cost-reimbursement type. Under these conditions, the Court agrees with Defendant that the bidder, especially one as experienced as UIIS, bore the risk of adequately recovering its costs within the boundaries of the fixed price that it bid.

The Federal Circuit's decision in *Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369 (Fed.Cir.2002) further counters Plaintiff's claim of an excusable misreading of the contract. *Hunt* requires a strict reading of the contract language to determine whether there is any ambiguity: "When the contract language is unambiguous on its face, our inquiry ends, and the plain language of the contract controls." *Id.* at 1373. In Hunt, the contractor bid on a hospital construction project for the Department of Veteran Affairs. The contract solicitation incorporated the same FAR-part in question here, FAR 52.229–3(b), providing that "[t]he contract price includes all applicable Federal, State, and local taxes and duties." The solicitation also included a "Special Notice" that "sales and use tax exemptions should be sought where applicable." In order to qualify for such tax exemptions, contractors must be designated as purchasing agents of the Government, a practice apparently generally

disfavored in federal government contracting. Based on the Special Notice, Hunt excluded state and local sales and use tax compensation from its bid, assuming it would be designated a government purchasing agent. After it won the bid and began construction, its request to the contracting officer to be so designated was declined. Thereupon, Hunt sued for the amount it paid out in such taxes that were not included in its bid. The Federal Circuit upheld the decision of the CFC granting summary judgment for the government.

Like Hunt's mistaken assumption that it would be designated a government purchasing agent, UIIS mistakenly assumed that, despite any contractual provision or USMS promise, it would be fully reimbursed for taxes not covered by its bid. In *Hunt*, the court held that the Special Notice "did not introduce ambiguity ... [n]othing in the Special Notice contradicts the clear language of FAR § 52.229–3." *Id.* at 1372. In other words, the suggestion of what might have been possible if the plaintiff had been awarded a sales and use tax exemption was insufficient to override the plain and strict language of the FAR. That same FAR in the UIIS contract, along with the plain language stating the time frame of its April 1 through September 30 "base year," ends the inquiry here. UIIS knew that its fixed-price hourly bid, which incorporated all applicable taxes, would be the basis for its payment for CSO services in the truncated base year. To the extent it thought about the front-loaded nature of the unemployment tax payments,[24] UIIS made a mistake of judgment,[25] for

---

**23.** Furthermore, both the RFP and the contract also provided that the contractor would only be guaranteed four months of work and that even this minimum guarantee was subject to the availability of funds. Def.'s Supp.App. at 49–50, 56 (§ H–10, entitled "Quantities for Minimums and Maximums").

**24.** In addition to the lack of ambiguity, Modification A003, § L–4(c)(7), footnote 3, should have served to remind Plaintiff that unemployment taxes are paid largely up-front:

Taxes include all federal, state, and local taxes which are directly chargeable to the direct labor rate. Each tax, e.g., FICA, should have

the applicable amount together with supporting information explaining how the amount was computed, *e.g., if state employment tax was 1.5% on the first $8,000.*

Def.'s Supp.App. at 22–23 (Modification A003, § L–4(c)(7), n. 3) (emphasis added).

**25.** At oral argument, Plaintiff's counsel confirmed Plaintiff's familiarity with the scheme for payment of unemployment taxes:

This was hardly the first contract that UIIS performed, so if the question is was it within UIIS's experience, as Your Honor put it, that unemployment taxes are front-loaded, in other words, you pay them up to a certain point of accrued annual salary and then not after that

which there is no remedy of contract reformation. Defendant is equally entitled to summary judgment on this issue of unemployment taxes.

## IV. Conclusion

Accordingly, for the reasons stated above, the Court **GRANTS** summary judgment for Defendant.

The Clerk of the Court is directed to dismiss the complaint.

point, I think it's fair to say that, based upon UIIS being an experienced contractor, UIIS probably had had that experience before.

Tr. 40:14–21, January 29, 2003.

